## ANTONI *v.* GREENHOW.

1. By issuing, pursuant to her "funding act" of March 30, 1871, her bonds with interest coupons thereto attached, the State of Virginia entered into a valid contract with every holder of the coupons, whereby she bound herself to receive them at and after their maturity for all taxes and demands due the State. So much of any enactment as forbids the receipt of the coupons for such taxes and demands impairs the obligation of the contract, and is void.

2. When the coupons were issued, the holder of them could, by the then existing law of the State, as interpreted by her court of last resort, enforce his right under the contract by suing out of that court a *mandamus* compelling the receipt of them by the proper tax-collector, who had refused to accept them when duly offered in payment of State taxes; and the plaintiff, if on the return to the writ judgment was rendered in his favor, could furthermore recover his costs with such damages as a jury might assess, and have forthwith a peremptory writ. By sect. 4 of an act passed Jan. 14, 1882, *post*, p. 771, when in such a case a *mandamus* is prayed for against the collector, the law imposes upon him as a duty to answer that he is ready to receive the offered coupon as soon as it shall be ascertained to be genuine and legally receivable for taxes. The taxpayer is then required to pay his taxes in lawful money, and file his coupon in the Court of Appeals, by which it is forwarded to the county court of the county, or to the hustings court of the city, where the taxes are payable, with directions to frame an issue as to whether it is genuine and legally receivable for taxes. Each party is entitled to exceptions and an appeal. If the issue is found for the petitioner, a *mandamus* is issued, and the money he paid is to be refunded to him out of the State treasury, in preference to all other claims. *Held*, that said sect. 4 furnishes an adequate and efficacious remedy substantially equivalent to that which existed at the date when the coupons were issued, whereby the rights of the holder of them, in case the collector refuses to receive them for taxes, can be maintained and enforced, and that the obligation of his contract with the State is not thereby impaired.

3. The court does not decide whether the act of the legislature, *post*, p. 779, approved April 7, 1882, after this suit was brought, repeals said sect. 4 of the act of Jan. 14, 1882, but holds that, if such is its effect, the remedy of the taxpayer is not rendered less efficient, inasmuch as the remaining sections furnish a proceeding which is an exact equivalent of that by *mandamus*, the real matter submitted for determination being whether his coupon ought to have been received in payment of his taxes; and if the issue is found for him, the provision is, without further legislative action, sufficient to authorize and require that the money which he deposited for that purpose shall be refunded to him from the State treasury.

ERROR to the Supreme Court of Appeals of the State of Virginia.

The case is stated in the opinion of the court.

*Mr. William L. Royall* for the plaintiff in error.

*Mr. Frank S. Blair*, Attorney-General of Virginia, for the defendant in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

On the 30th of March, 1871, the General Assembly of Virginia passed an act to provide for the funding and payment of the public debt, by which two-thirds of the amount due on old bonds might be funded in new bonds, with interest coupons attached " receivable at and after maturity for all taxes, debts, dues, and demands due the State." Under this act many bonds were put out with coupons which expressed on their face that they were receivable for taxes. On the 7th of March, 1872, however, the General Assembly passed another act prohibiting the officers charged by law with the collection of taxes from receiving in payment anything else than gold and silver coin, United States treasury notes, and notes of the national banks, and repealing all other acts inconsistent therewith.

The Supreme Court of Appeals of Virginia decided, at its November Term, 1872, in *Antoni* v. *Wright*, 22 Gratt. 833, that in issuing these bonds the State entered into a valid contract with all persons taking the coupons to receive them in payment of taxes and State dues, and that the act of 1872, so far as it conflicted with this contract, was void. The authority of this case was recognized in *Wise* v. *Rogers*, 24 id. 169; and in *Clarke* v. *Tyler*, 30 id. 134, 137, decided in 1878, it was said: " This

decision of *Antoni* v. *Wright* . . . must be held to be the settled law of this State." The same questions were decided in the same way here at the October Term, 1880, in *Greenhow* v. *Hartman,* 102 U. S. 672, and are no longer open in this court. Any act of the State which forbids the receipt of these coupons for taxes is a violation of the contract and void as against coupon-holders.

At the time the act of 1871 was passed, and when the bonds and coupons were issued, the Supreme Court of Appeals of the State had jurisdiction to grant a *mandamus* in any cases where the writ would lie, according to the principles of the common law, if necessary to prevent a failure of justice ; and in *Antoni* v. *Wright, ubi supra,* it was decided that a *mandamus* was the proper remedy to compel a collector to accept the coupons in question when offered in payment of taxes. *Vise* v. *Rogers* presented the same question, and we understand it to have been the settled practice of that court to entertain suits for similar relief.

The form and mode of proceeding were regulated by statute. Sect. 1, c. 151, of the Code of Virginia, 1873, p. 1023, provided that the return to a writ of *mandamus* should state plainly and concisely the matter of law or fact relied on in opposition to the complaint ; that the complainant might thereupon demur to the return, or plead thereto, or both, and that the defendant might reply, take issue on, or demur to the pleas of the complainant. The case was to be tried at the place where writs of error to the court were to be tried, and after a verdict was found, or judgment rendered on demurrer or otherwise for the person suing out the writ, he could recover his costs, with such damages as the jury might assess, and have forthwith a peremptory writ. Code, p. 1051.

On the 14th of January, 1882, the General Assembly passed the following act : —

"CHAP. 7. — *An Act to prevent frauds upon the Commonwealth and the holders of her securities in the collection and disbursement of revenues.*

"Whereas, bonds purporting to be the bonds of this Commonwealth, issued by authority of the act of March thirtieth, eighteen hundred and seventy-one, entitled an act to provide for the funding and payment of the public debt, and under the act of March twenty-eight, eighteen hundred and seventy-nine, entitled an act

to provide a plan of settlement of the public debt, are in existence without authority of law ;

" And whereas, other such bonds are in existence which are spurious, stolen, or forged, which bonds bear coupons in the similitude of genuine coupons, receivable for all taxes, debts, and demands due the Commonwealth ;

" And whereas, the coupons from such spurious, stolen, or forged bonds are received in payment of taxes, debts, and demands ;

" And whereas, genuine coupons from genuine bonds, after having been received in payment of taxes, debts, and demands, are fraudulently reissued, and received more than once in such payments ;

" And whereas, such frauds on the rights of the holders of the aforesaid bonds impair the contract made by the Commonwealth with them, that the coupons thereon should be received in payment of all taxes, debts, and demands due the said Commonwealth, and at the same time defraud her out of her revenues ;

" Therefore, for the purpose of protecting the rights of said bondholders and of enforcing the said contract between them and the Commonwealth, preventing frauds in the revenue of the same,

" 1. *Be it enacted by the General Assembly of Virginia,* That whenever any taxpayer or his agent shall tender to any person whose duty it is to collect or receive taxes, debts, or demands due the Commonwealth, any papers or instruments in print, writing, or engraving, purporting to be coupons detached from bonds of the Commonwealth issued under the act of eighteen hundred and seventy-one, entitled an act to fund the public debt, in payment of any such taxes, debts, and demands, the person to whom such papers are tendered shall receive the same, giving the party tendering a receipt stating that he has received the same for the purpose of identification and verification.

" 2. He shall at the same time require such taxpayer to pay his taxes in coin, legal-tender notes, or national-bank bills, and upon payment give him a receipt for the same. In case of refusal to pay, the taxes due shall be collected as all other delinquent taxes are collected.

" 3. He shall mark each paper as coupons so received, with the initials of the taxpayer from whom received, and the date of receipt, and shall deliver the same, securely sealed up, to the judge of the county court of the county or hustings court of the city in which such taxes, debts, or demands are payable. The taxpayer shall thereupon be at liberty to file his petition in said county court against the Commonwealth. A summons to answer which petition shall be served on the Commonwealth's attorney, who shall appear and defend the

same. The petition shall allege that he has tendered certain coupons in payment of his taxes, debts, and demands, and pray that a, jury be impanelled to try whether they are genuine, legal coupons, which are legally receivable for taxes, debts, and demands. Upon this petition an issue shall be made in behalf of the Commonwealth which shall be tried by a jury, and either party shall have a right to exceptions on the trial and of appeal to the Circuit Court and Court of Appeals. If it be finally decided in favor of the petitioner that the coupons tendered by him are genuine, legal coupons, which are legally receivable for taxes, and so forth, then the judgment of the court shall be certified to the treasurer, who, upon the receipt thereof, shall receive said coupons for taxes and shall refund the money before then paid for his taxes by the taxpayer out of the first money in the treasury, in preference to all other claims.

"4. Whenever any taxpayer shall apply to any court in this Commonwealth for a *mandamus* to compel any person authorized to receive or collect taxes, debts, or demands due the Commonwealth to receive coupons for taxes, it shall be the duty of such person to make return to said *mandamus*, that he is ready to receive said coupons in payment of such taxes, debts, and demands as soon as they have been legally ascertained to be genuine, and the coupons which by law are actually receivable. Upon such return, the court before whom the application is made shall require the petitioner to pay his taxes to the tax-collector of his county or city, or to the treasurer of the Commonwealth, and upon filing the receipt for such taxes in such court the said court shall direct the petitioner to file his coupons in such court, which shall then forward the same to the county court of the county or hustings court of the city where such taxes are payable, and direct such court to frame an issue between the petitioner as plaintiff and the Commonwealth as defendant as to whether the coupons so tendered are genuine coupons, legally receivable for taxes. On the trial of the cause the attorney for the Commonwealth in the lower courts and the attorney-general in the Supreme Court of Appeals, shall appear for the Commonwealth and require proof of the genuineness and legality of the coupons in issue. Either party shall be entitled to exceptions, and an appeal to the Circuit Court and Supreme Court of Appeals on the trial of this issue. If the decision be finally in favor of the petitioner, the *mandamus* shall issue requiring the coupons to be received for said taxes, and so forth; and they shall be so received; and on the certificate of such judgment the treasurer of the Commonwealth shall forthwith refund to the taxpayer the amount

of currency or money before then paid by him out of the first money in the treasury, in preference to all other claims.

"5. This act shall be in force from its passage."

On the 20th of March, 1882, Andrew Antoni, who owed the State taxes to the amount of three dollars and fifteen cents, tendered in payment, to the treasurer of the city of Richmond, the tax-collector, fifteen cents in lawful money, and a coupon, of the issue of 1871, for three dollars. This tender was refused, and Antoni, on the 28th of March, petitioned the Supreme Court of Appeals for a *mandamus* to require its acceptance. The treasurer, on the 30th of March, for a return to an order to show cause, said that he was ready to receive the coupon as soon as it had been legally ascertained to be genuine, and such as by law was actually receivable. To this return a demurrer was filed. Upon the hearing of the demurrer, the court being equally divided in opinion on the questions involved, "in pursuance of an act of assembly in such case made and provided," denied the writ. From a judgment to that effect this writ of error was brought.

The question we are now to consider is not whether, if the coupon tendered is in fact genuine and such as ought, under the contract, to be received, and the tender is kept good, the treasurer can proceed to collect the tax by distraint or such other process as the law allows, without making himself personally responsible for any trespass he may commit, but whether the act of 1882 violates any implied obligation of the State in respect to the remedies that may be employed for the enforcement of its contract, if the collector refuses to take the coupon.

It cannot be denied that, as a general rule, laws applicable to the case which are in force at the time and place of making a contract enter into and form part of the contract itself, and "that this embraces alike those laws which affect its validity, construction, discharge, and enforcement." *Walker* v. *Whitehead*, 16 Wall. 314, 317. But it is equally well settled that changes in the forms of action and modes of proceeding do not amount to an impairment of the obligations of a contract, if an adequate and efficacious remedy is left. This limitation upon the prohibitory clause of the Constitution in respect to the

legislative power of the States over the obligation of contracts was suggested by Chief Justice Marshall in *Sturges* v. *Crowninshield*, 4 Wheat. 122, and has been uniformly acted on since. *Mason* v. *Haile*, 12 Wheat. 370; *Bronson* v. *Kinzie*, 1 How. 311; *Von Hoffman* v. *City of Quincy*, 4 Wall. 535; *Drehman* v. *Stifle*, 8 id. 595; *Gunn* v. *Barry*, 15 id. 611; *Walker* v. *Whitehead*, 16 id. 314; *Terry* v. *Anderson*, 95 U. S. 628; *Tennessee* v. *Sneed*, 96 id. 69; *Louisiana* v. *Pilsbury*, 105 id. 278. As was very properly said by Mr. Justice Swayne in *Von Hoffman* v. *City of Quincy, ubi supra,* " It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances. Whenever the result last mentioned is produced the act is within the prohibition of the Constitution, and to that extent void." p. 553. In all such cases the question becomes, therefore, one of reasonableness, and of that the legislature is primarily the judge. *Jackson* v. *Lamphire,* 3 Pet. 280; *Terry* v. *Anderson, ubi supra.* We ought never to overrule the decision of the legislative department of the government, unless a palpable error has been committed. If a state of facts could exist that would just'fy the change in a remedy which has been made, we must presume it did exist, and that the law was passed on that account. *Munn* v. *Illinois,* 94 U. S. 113. We have nothing to do with the motives of the legislature, if what they do is within the scope of their powers under the Constitution.

The right of the coupon-holder is to have his coupon received for taxes when offered. The question here is not as to that right, but as to the remedy the holder has for its enforcement when denied. At the time the coupon was issued, there was a remedy by *mandamus* from the Supreme Court of Appeals to compel the tax-collector to take the coupon and cancel the tax. This implied a suit, with process, pleadings, issues, trial, and judgment. No restrictions were placed on the defences the collector could make. He might raise such issues as he chose.

Without the aid of some restraining power, the mere pendency of the suit would not prevent the collector from proceeding according to law with the collection of the tax. He might, if he went on, subject himself to liability for damages, if the tender was one he ought to have accepted; but there was nothing to prevent his going on if he chose to take this risk.

Under this law the trial must be had in the Supreme Court of Appeals at the time and place where it was to be held for other purposes. There was nothing in the law to give the case preference over others for trial. So far as we are informed, it stood as other cases before the court, and was subject to such orders as should seem to be reasonable. The tax-collector could not be compelled to accept the coupon and discharge the tax until final judgment. If the final judgment was in favor of the holder, he recovered his costs and such damages as the jury might give him.

Under sect. 4 of the act of 1882, when a *mandamus* is asked for, the collector is required by law to return to the alternative writ or rule " that he is ready to receive said coupons in payment of such taxes, . . . as soon as they have been legally ascertained to be genuine, and the coupons which by law are actually receivable." Upon such return the court must require the petitioner to pay his taxes, which being done the coupons are taken and forwarded to the county court of the county or the hustings court of the city where the taxes are payable, with directions to that court to frame an issue between the petitioner as plaintiff and the Commonwealth as defendant, as to whether the coupons so tendered are genuine coupons, legally receivable for taxes. Upon this issue proof of the genuineness and legality of the coupons must be made. Either party may take exceptions and carry the case, on appeal, to the Circuit Court and the Supreme Court of Appeals. If the decision is in favor of the petitioner, a *mandamus* is to issue and the money he paid returned to him out of the first money in the treasury, in preference to all other claims.

The following changes are thus made in the old remedy: 1. The taxes actually due must be paid in money before the court can proceed, after the collector has signified in the proper way his willingness to receive the coupons, if they are genuine

and in law receivable; 2. The coupons must be filed in the Court of Appeals; and, 3. They must be sent to the local court to have the fact of their genuineness and receivability determined, subject to an appeal to the Circuit Court and the Supreme Court of Appeals. As the suit is for a *mandamus*, all the provisions of the general law regulating the practice not inconsistent with the new law remain; and if the petitioner succeeds in getting his peremptory writ he will recover his costs. No issues are required that it would not have been in the power of the collector to raise before the change was made, and there is no additional burden of proof imposed to meet the issues; so that the simple question is, whether the requirement of the advance of the taxes, and the change of the place and manner of trial, impair the obligation of the contract on the part of the State to furnish an adequate and efficacious remedy to compel a tax-collector to receive the coupons in payment of taxes, in case he will not do it without compulsion.

1. As to the payment of the taxes in advance.

In this connection it must be borne in mind that the legislation, the validity of which is involved, relates alone to the collection of taxes levied under the authority of the State for the purposes of revenue. Promptness in the payment of taxes by the citizen is as important as promptness by the State in the discharge of its own obligations. In fact, ordinarily the last cannot be done without the first. Hence, under the revenue system of the United States, the collection of the revenue in the manner prescribed by law cannot be restrained by judicial proceedings. The only remedy for an illegal exaction is payment under protest and a suit to recover back the money paid. The reason is, that as it is necessary the government should be able to calculate with certainty on its revenues, it is better that the individual should be required to pay what is demanded under the forms of law, and sue to recover back what he pays, than that the government should be embarrassed in its operations by a stay of collection.

It is to be noticed also that the law which authorized the issue of the bonds and coupons did not in express terms provide that the coupon-holder should have the remedy of *mandamus* to compel the tax-collector to take his coupons. His claim to

relief in that way rests alone on the fact, that when his coupon was issued *mandamus* was an existing form of action in the State, which the courts have decided was applicable to such a case. What the legislature has done is only to say, that before this remedy can be resorted to the amount due for taxes shall be deposited in the treasury. That being done, the suit may go on. If in the suit it shall be determined that the coupons tendered are genuine and in law receivable, the collector will be required to accept them, and the money will be restored. If, however, the judgment is against the coupon-holder, the taxes will be paid, and the State will have suffered no inconvenience for want of its just revenues. Looking at the case, therefore, as one affecting the collection of the public revenue, we cannot see that the requirement of the advance of the taxes as a condition to the employment of the remedy is such an impairment of the contract as makes the requirement invalid.

2. As to the change in the place and mode of trial.

We cannot think this of itself invalidates the law. So far as the change of place is concerned, it simply takes from the Supreme Court of Appeals jurisdiction for the trial of the questions of fact, and confers precisely the same jurisdiction upon another court, with ample provision for appeal, so that in the end the authority of the Court of Appeals may be invoked on all matters of law. The courts on which the new jurisdiction is conferred are required by law to hold frequent terms, and the trial is to be had in the county where the taxes are to be paid. It is difficult to see how this impairs, in any manner, either the adequacy or the efficiency of the original remedy.

Then, as to the manner of the trial. The deposit of the coupons with the Court of Appeals, if the suit is to go on, cannot be considered unreasonable. If the trial had been conducted under the old law, the coupons would have to be at some time surrendered, and the precise stage of the case in which this is to be done is by no means important, so far as the present question is concerned. Neither does the positive requirement of an issue as to the genuineness and receivability of the coupons and a trial by jury affect the validity of the law. Under the old law, this same issue might have been raised, and the same trial by jury required. It certainly is not an impair-

ment of an old remedy to make that imperative which before was discretionary.

Without pursuing the subject further, we say that, in our opinion, the fourth section of the act of 1882 does not impair the obligation of any contract which the State has made with the holders of its interest coupons.

After this suit was begun, but before it was tried, the General Assembly of Virginia, by an act approved April 7, 1882, amended the section of the code conferring jurisdiction on the Supreme Court of Appeals in suits for *mandamus*, so that it now reads as follows: —

"CHAP. 19. — *An Act to amend and re-enact section four, chapter one hundred and fifty-six, of the code of eighteen hundred and seventy-three, in relation to mandamus, prohibition, &c.*

1. "*Be it enacted by the General Assembly of Virginia*, That chapter one hundred and fifty-six, section four, of the Code of Virginia of eighteen hundred and seventy-three, be amended and re-enacted, so as to read as follows: —

" SECT. 4. The said Supreme Court, besides having jurisdiction of all such matters as are now pending therein, shall have jurisdiction to issue writs of *mandamus* and prohibition to the circuit and corporation courts, and to the hustings court and the chancery court of the city of Richmond, and in all other cases in which it may be necessary to prevent a failure of justice, in which a *mandamus* may issue according to the principles of the common law, provided that no writ of *mandamus,* prohibition, or any other summary process whatever, shall issue in any case of the collection or attempt to collect revenue, or compel the collecting officers to receive anything in payment of taxes other than as provided in chapter forty-one, acts of assembly, approved January twenty-six, eighteen hundred and eighty-two, or in any case arising out of the collection of revenue in which the applicant for the writ of process has any other remedy adequate for the protection and enforcement of his individual right, claim, and demand, if just.

" The practice and proceedings upon such writs shall be governed and regulated, in all cases, by the principles and practice now prevailing in respect to writs of *mandamus* and prohibition respectively.

"2. This act shall be in force from its passage."

This, it is claimed, repealed sect. 4 of the act of January, 1882, and took away entirely the remedy by *mandamus*. Without deciding that question we proceed to consider the remedy provided in sects. 1, 2, and 3 of the act of 1882, which, it is conceded, will remain in force even if sect. 4 is repealed. These sections provide, in substance, that if coupons are tendered in payment of taxes, the collector shall take and receipt for them for the purposes of identification and verification. He shall then require payment of the taxes in money, and after marking the coupons with the initials of the name of the owner, deliver them to the judge of the county court of the county or hustings court of the city where the taxes are payable. The taxpayer may then file his petition in the county or hustings court against the Commonwealth to have a jury impanelled to try whether the coupons " are genuine, legal coupons, which are legally receivable for taxes, debts, and demands." The Commonwealth may be brought into court by service of a summons on the Commonwealth's attorney. Upon this petition an issue is framed and a trial by jury is to be had, with ample privileges to all parties of exception and appeal. If the suit is finally decided in favor of the taxpayer, he is to have the amount paid by him for the taxes refunded out of the first money in the treasury, in preference to all other claims.

It is somewhat difficult to see any substantial difference between the remedy given by these sections and that by sect. 4. There the form of the suit is *mandamus* begun while the coupons are in the hands of the taxpayer. After the suit has been begun the court requires a delivery of the coupons into its own possession, and the payment of the amount of the taxes into the treasury. This being done, the court sends the coupons to the appropriate tribunal for adjudication, and the proceedings thereafter are in all material respects like those provided for in the other sections. The judgment is also the same, except as to the merest matters of form. In both proceedings the object is to require the collector to accept the coupons as payment of the tax, and deliver back the money that has been deposited for the same purpose in case the coupons are not in law receivable. The petition for *mandamus*, filed in the Court of Appeals, under sect. 4, is the exact equivalent of the petition

to be filed in the other courts, under sects. 1, 2, and 3, to have the genuineness and the receivability of the coupons determined, and in both the real matter submitted for determination is, whether the taxpayer is entitled to have back the money he has deposited to pay his taxes in case his coupons ought to have been received.

*Mandamus*, in this class of cases, is in the nature of a suit to enforce the specific performance of a contract. But in the present case the performance sought is the payment of money, and the remedy substituted is equivalent to an action for its recovery, with ample provision for the satisfaction of any judgment that may be obtained; for it is made the ministerial duty of the treasurer to pay the amount of the recovery out of the first money in the treasury, and in preference to all other claims, as soon as the judgment is properly certified. The language of the act is, " shall refund the money before then paid for his taxes by the taxpayer out of the first money in the treasury in preference to all other claims." Clearly this is an appropriation by law of money in the treasury, within the meaning of art. 10, sect. 10, of the Constitution of Virginia, and the treasurer would be authorized to make the payment without further legislative action. It will be time enough to consider the effect of a repeal of this branch of the remedy when that shall be attempted.

The primary obligation of the State is for the payment of the coupons. All else is simply as a means to that end. It matters not whether the coupons have been refused for the taxes, if full payment of the amount they call for is actually made in money. A remedy, therefore, which is ample for the enforcement of the payment of the money is ample for all the purposes of the contract. That, we think, is given by the act of 1882 in both forms of proceeding.

Some objection is made to the first, second, and third sections because there is no provision for the recovery of costs. Without determining whether in point of fact costs can be recovered, it is sufficient to say that costs, *eo nomine*, were not recoverable at common law, and are usually regulated by statute. Certainly it would not be claimed that the change of an ordinary statute, which provided a remedy for the enforcement

of· contracts, so as to prevent the recovery of costs when they had been given before, would impair the obligation of contracts between individuals that were affected by what was done, and we see no reason why one rule, in this particular, should be applied to individuals and another to the State.

In conclusion, we repeat that the question presented by this record is not whether the tax-collector is bound in law to receive the coupon, notwithstanding the legislation which, on its face, prohibits him from doing so, nor whether, if he refuses to take the coupon and proceeds with the collection of the tax by force, he can be made personally responsible in damages for what he does, but whether the obligation of the contract has been impaired by the changes which have been made in the remedies for its enforcement in case he refuses to accept the coupons. We decide only the question which is actually before us. It is no doubt true that the commercial value of the bonds and coupons has been impaired by the hostile legislation of the State; but this impairment, in our opinion, comes not from the change of the remedies, but from the refusal to accept the coupons without suit. What we are called upon to consider in this case is not the refusal to take the coupons, but the remedy after refusal.

We might have satisfied ourselves by a reference to the case of *Tennessee* v. *Sneed, ubi supra,* where the same general question was before us; but as we were asked to reconsider that case, we have done so with the same result, and, as we think, without in any manner departing from the long line of cases in which the principle involved has been recognized and applied.

Inasmuch as we are satisfied that a remedy is given by the act of 1882, substantially equivalent to that in force when the coupons were issued, we have not deemed it necessary to consider what would be the effect of a statute taking away all remedies.

*Judgment affirmed.*

MR. JUSTICE MATTHEWS. I concur in the judgment of the court, but prefer to rest the decision upon a ground different from that on which it is placed in its opinion.

I agree that the State of Virginia, by the act of 1871, entered into a valid contract with the holders of its bonds to receive their coupons in payment of taxes; and that any subsequent statute which denies this right is a breach of its contract and a violation of the Constitution of the United States.

But for a breach of its contract by a State no remedy is provided by the Constitution of the United States against the State itself; and a suit to compel the officers of a State to do the acts which constitute a performance of its contract by the State is a suit against the State itself.

If the State furnishes a remedy by process against itself or its officers, that process may be pursued because it has consented to submit itself to that extent to the jurisdiction of the courts; but if it chooses to withdraw its consent by a repeal of all remedies, it is restored to the immunity from suit, which belongs to it as a political community, responsible in that particular to no superior.

I adopt as decisive of the present case the language of the Chief Justice, in expressing the opinion of the court in *Louisiana* v. *Jumel, ante,* pp. 711, 728: " When a State submits itself, without reservation, to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the State has, by its act of submission, allowed to be done; and if the law permits coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose. But this is very far from authorizing the courts, when a State cannot be sued, to set up its jurisdiction over the officers in charge of the public moneys, so as to control them as against the political power in their administration of the finances of the State."

I do not, therefore, consider it necessary to enter upon the inquiry, whether the remedy provided by the State of Virginia, by the act of 1882, is effective and substantial compared with that which existed in 1871, when the bonds were issued. It is sufficient to say that it is the one which the State has chosen to give, and the only one, therefore, which the courts of the United States are authorized to administer.

MR. JUSTICE BRADLEY, MR. JUSTICE WOODS, and MR. JUSTICE GRAY concurred in the judgment upon both grounds: that stated in the opinion of the court as delivered by the Chief Justice, and that stated in the opinion of MR. JUSTICE MATTHEWS.

MR. JUSTICE FIELD and MR. JUSTICE HARLAN dissented.

MR. JUSTICE FIELD. I am not able to agree with the majority of the court in the judgment in this case, nor in the reasoning on which it is founded. The legislation of Virginia, which is sustained, appears to me to be in flagrant violation of the contract with her creditors under the act of March 30, 1871, commonly known as the Funding Act; and the doctrines advanced by the court, though not so intended, do, in fact, license any disregard of her obligations which the ill-advised policy of her legislators may suggest.

The plaintiff in error, the petitioner in the court below, is a citizen of Virginia and a resident of the city of Richmond. He owns property there, and on the 20th of March, 1882, was indebted to the State for taxes to the amount of three dollars and fifteen cents. At that time he was also the lawful holder of an overdue interest-coupon for three dollars, which had been cut from a bond of the State, issued under the provisions of the Funding Act. This coupon is in the following words : —

" The Commonwealth of Virginia will pay the bearer three dollars, interest due first January, 1882, on bond 6,498.

                                        " GEORGE RYE,
                            " Treasurer of the Commonwealth of Virginia.

" Coupon No. 21."

And on its face it thus declares : —

" Receivable at and after maturity for all taxes, debts, and demands due the State."

The receivability of such coupons for State taxes, debts, and demands was, as will hereafter be shown, the principal consideration for the surrender of former bonds of the State and the acceptance of a less number in their place.

The petitioner, in payment of his taxes, tendered the coupon he held and fifteen cents in money to the treasurer of Richmond, who was charged by law with the duty of collecting taxes due to the State in that city; but he refused to receive them.   Application was then made to the Supreme Court of Appeals to compel their receipt.   The treasurer set up in his answer that he was ready to receive the coupon in payment of the taxes as soon as it was ascertained to be genuine and legally receivable.   This answer was founded upon the provisions of the act of Jan. 14, 1882, entitled "An Act to prevent frauds upon the Commonwealth and the holders of her securities in the collection and disbursement of revenues."   Upon the validity of its provisions the judges of the Court of Appeals were equally divided, and the application failed.   The preamble of the act recites that bonds purporting to be those of the Commonwealth, issued under the act of March 30, 1871, are in existence without authority of law; that other bonds are in existence, which are spurious, stolen, or forged, bearing coupons in the similitude of those which are genuine and receivable for taxes, debts, and demands of the State; that coupons from such spurious, stolen, and forged bonds are received in payment of such taxes, debts, and demands; that coupons from genuine bonds, after having been thus received, are frequently reissued and received more than once in such payment; and that such frauds on the rights of the holders of the bonds impair the contract made by the Commonwealth with them, and, therefore, for the alleged purpose of protecting the rights of the bondholders, and of enforcing the contract between them and the State, the act declares that whenever any taxpayer or his agent shall tender to a collector any papers or instruments in print purporting to be coupons detached from bonds of the Commonwealth, issued under the act of 1871, to fund the public debt, the collector shall receive the same, and give the party tendering a receipt, stating that he has received them for the purpose of identification and verification; that he shall, at the same time, require such taxpayer to pay his taxes in coin, legal-tender notes, or national-bank bills, and if payment be refused, the taxes shall be collected as other delinquent taxes; that the collector shall mark each coupon thus received with

the initials of the taxpayer, and deliver them sealed up to the judge of the county court of the county or hustings court of the city in which the taxes are payable. It then provides that the taxpayer shall be at liberty to file his petition in said county court against the Commonwealth; that a summons to answer the same shall be served on the Commonwealth's attorney, who is to appear and defend the same; that in his petition the taxpayer must allege that he has tendered the coupons in payment of his taxes, and pray that a jury be impanelled " to try whether they are genuine legal coupons, which are legally receivable for taxes, debts, and demands." Upon this petition an issue is to be made on behalf of the Commonwealth, which is to be tried by a jury, and either party is to have a right to exceptions on the trial and to an appeal to the Circuit Court and ultimately to the Court of Appeals. If it be finally decided in favor of the petitioner that the coupons are "genuine, legal coupons, receivable for taxes, and so forth," then the judgment of the court is to be certified to the treasurer of the Commonwealth, who, upon receipt thereof, shall receive the coupons for taxes and refund to the taxpayer the amount before paid by him out of the first money in the treasury, in preference to other claims.

The act also provides that whenever any taxpayer applies to a court for a *mandamus* to compel a collector of taxes to receive coupons for them, it shall be the duty of the collector to return that he is ready to receive, in payment of the taxes, the coupons as soon as they have been legally ascertained to be genuine, and by law actually receivable; and that, upon such return being made, the court shall require the petitioner to pay his taxes to the collector of the city or county, or to the treasurer of the Commonwealth; and upon filing the receipt for the same, that the court shall direct the petitioner to file his coupons in court, which shall then forward the same to the county court of the county or hustings court of the city where the taxes are payable, and direct that court to frame an issue between the petitioner and the Commonwealth as to whether the coupons thus tendered are genuine and legally receivable for taxes. On the trial either party is to be entitled to exceptions, and to an appeal to the Circuit Court and to the Supreme

Court of Appeals. If the decision be finally in favor of the petitioner, he is to be entitled to a *mandamus* that the coupon be received for taxes; but inasmuch as those taxes have already been paid, they are to be refunded by the treasurer of the Commonwealth out of the first money in the treasury, in preference to all other claims. A subsequent act, passed on the 7th of April, 1882, amending a section of the Code of Virginia of 1873, prohibits the Supreme Court of Appeals from issuing the writ of *mandamus* or any other summary process to compel the collecting officers of the State to receive anything in payment of taxes other than gold or silver, treasury notes of the United States, or bills of the national banks.

The question for decision here is as to the constitutionality of the act of Jan. 14, 1882, which destroys the receivability of the coupon for taxes, allows a suit for the recovery of its amount only after they have been paid, and authorizes a recovery only when the jury have found that it is genuine and legally receivable for them, and of the act of April 7, 1882, which withdraws from the Supreme Court of Appeals the power to compel the receivability of the coupon for taxes. In other words, Do these acts impair the obligation of the contract upon which the coupons were originally issued?

A brief reference to the history of the Funding Act of 1871 will serve to place this subject in a clear light. Prior to the late war Virginia constructed various public works, and to enable her to do so she borrowed large sums of money, for which she issued her bonds, exceeding in amount thirty millions of dollars. The interest on them was regularly paid up to the breaking out of the war. Afterwards its payments ceased, and until 1871, with the exception of some small sums remitted to London for foreign bondholders or paid in Virginia in Confederate money, and a small amount in 1866 and 1867, no part of the interest or principal was ever paid. In 1871, the principal of her debt, with its unpaid and overdue interest, amounted to over forty-five millions of dollars.

During the war the people of a portion of her territory separated from her, and formed a new State, by the name of West Virginia, which was admitted by Congress into the Union. Nearly one-third of the territory of Virginia and one-third of

her people were thus withdrawn from her original limits and jurisdiction. Her then indebtedness was justly chargeable against her and the new State in some ratable proportion. The money raised by her bonds had been expended in improvements throughout her entire territory. All portions of it had participated in the benefits conferred by the expenditure of the moneys. It was but just, therefore, that the new State should assume and pay an equitable proportion of the debt. It is a well-settled doctrine of public law that, upon a division of a State into two or more States, her debts shall be ratably apportioned among them. See authorities upon this subject in *Hartman* v. *Greenhow,* 102 U. S. 672, 677.

In conformity with this doctrine, West Virginia, in her first Constitution, adopted in 1863, recognized her liability in this respect, and declared that " an equitable proportion of the public debt of the Commonwealth of Virginia prior to the first day of January in the year 1861 shall be assumed by this State, and the legislature shall ascertain the same as soon as may be practicable, and provide for the liquidation thereof by a sinking fund sufficient to pay the accruing interest and redeem the principal within thirty-four years." Constitution of 1863, art. 8, sect. 8. She, however, did nothing, up to 1871, to give effect to this unequivocal and solemn recognition of her liability, or to her positive injunction that the legislature should, as soon as practicable, ascertain the same and provide for its liquidation; and she has done nothing since.

The Commonwealth of Virginia, nevertheless, undertook in that year to effect a settlement with her creditors, taking as a basis that inasmuch as one-third of her former territory and population was embraced in the new State, the latter should assume one-third of the debt, and the Commonwealth should settle for the remainder. Accordingly, her legislature on the 30th of March, 1871, passed the Funding Act. It is entitled " An Act to provide for the funding and payment of the public debt." Its preamble recites that, in the ordinance authorizing the creation of the State of West Virginia, it was provided that she should take upon herself a just proportion of the public debt of the Commonwealth of Virginia prior to the first day of January, 1861, and that this provision has not been

fulfilled, although repeated and earnest efforts in that behalf have been made by Virginia, and that the people of the Commonwealth are anxious for the prompt liquidation of her proportion of the debt, estimated at two-thirds of the same ; and then declares that to enable the State of West Virginia to settle her proportion of said debt with the holders thereof, and to prevent any complications or difficulties which may be interposed to any other manner of settlement, and for the purpose of promptly restoring the credit of Virginia, by providing for the prompt and certain payment of the interest upon the just proportion of her debt as the same should become due, the legislature enacts that the owners of the bonds, stocks, or interest certificates of the State, with some exceptions, may fund two-thirds of the amount of the same, together with two-thirds of the interest due, or to become due, thereon, up to July 1, 1871, in six per cent coupon or registered bonds of the State having thirty-four years to run, but redeemable at the pleasure of the State after ten years, the bonds to be made payable to order or bearer, and the coupons to bearer. The act declares that the coupons shall be payable semi-annually, and "be receivable at and after maturity for all taxes, dues, and demands due the State," which shall be so expressed on their face, and that the bonds shall bear on their face a declaration to the effect that their redemption is secured by a sinking fund, provided for by the law under which they were issued. For the remaining one-third of the amount of the bonds thus funded the act provides that certificates shall be issued to the creditors, setting forth the amount, with the interest thereon, and that their payment shall be provided for in accordance with such settlement as may subsequently be made between the two States, and that Virginia will hold the bonds surrendered, so far as they are not funded, in trust for the holder or his assignees.

This act induced a large number of creditors to surrender their bonds, and take new bonds, with interest coupons annexed, for two-thirds of their amount and certificates for the balance. The number of bonds surrendered amounted to about thirty millions of dollars, for which new bonds to the amount of twenty millions were issued. A contract was thus executed

between the State and the holders of the new coupons which the State could not afterwards impair. As this court, with only one dissenting member, said in *Hartman* v. *Greenhow* with respect to this contract: " She thus bound herself not only to pay the bonds when they became due, but to receive the interest-coupons from the bearer at and after their maturity, to their full amount, for any taxes or dues by him to the State. This receivability of the coupons for such taxes and dues was written on their face, and accompanied them into whatever hands they passed. It constituted their chief value, and was the main consideration offered to the holders of the old bonds to surrender them and accept new bonds for two-thirds of their amount." 102 U. S. 672, 679.

The Supreme Court of Appeals of Virginia had previously spoken, with respect to this contract, with equal clearness. Notwithstanding the language of the act of March 30, 1871, declaring that the interest coupons of the new bonds shall be " receivable at and after maturity for all taxes, debts, dues, and demands due the State," and this is expressed upon their face, the legislature of Virginia, within less than a year afterwards, on March 7, 1872, passed an act declaring that it shall not be lawful for any officers charged with the collection of taxes or other demands of the State then due, or to become due, " to receive in payment thereof anything else than gold or silver coin, United States treasury notes, or notes of the national banks." As this act was in direct conflict with that of March 30, 1871, its validity was assailed, and came before the Court of Appeals, in *Antoni* v. *Wright*, at the November Term, 1872. 22 Gratt. (Va.) 833. In an opinion of great ability and learning, the character and effect of the Funding Act were elaborately considered; and it was held that its provisions constituted a contract founded upon valuable considerations and binding upon the State. By the decision of the State court in that case, and of this court in *Hartman* v. *Greenhow*, the receivability of the coupons for taxes and demands of the State was held to be an essential part of the contract on which the bonds were received, and to constitute the chief value of the coupon and the principal inducement offered for the surrender of the old bonds and the acceptance of two-thirds of their amount. When the legis-

lature subsequently attempted to annul this receivability, and required coin or currency to be received for taxes, the Court of Appeals held that such interference with the receivability of the coupons impaired the obligation of the contract and was void. When again the legislature attempted to impair that receivability, by requiring the tax on the bond to which it originally belonged to be first deducted from the amount of the coupon before it could be received for other taxes, this court held that the legislation impaired the obligation of the contract. But now, strange to say, a law is sustained, as not impairing the obligation of the contract, although it prohibits the receivability of the coupons for State taxes, dues, and demands, and requires the holder to pay them in coin, treasury notes, or bills of the national banks, and, in return, gives him the privilege only, upon surrendering it, to test its genuineness and its receivability for taxes by instituting a suit, in which a jury is to be summoned, and any decision obtained may be taken to the Circuit Court and to the Court of Appeals. If final judgment shall be obtained that the coupon is genuine and legally receivable for taxes, the court is required to certify it to the treasurer of the Commonwealth, who shall then receive the coupon for taxes, that is to say, long after they are paid, and refund its amount out of the first money in the treasury, in preference to other claims. If there be no money in the treasury not otherwise appropriated, he may have to wait an indefinite period until the treasury is replenished. Not only does this act entail prolonged delay and expense in every case, but, in a majority of cases, the expense would exceed the amount of the coupon. Where only a few hundred dollars in bonds are held, the amount of the coupons would not justify the expenditure. Coupons for small amounts are thus rendered practically of no value. Their receivability for taxes, dues, and demands of the State is effectually destroyed.

Under the act of Jan. 14, 1882, there is no equivalent given to the creditor for the receivability of the coupon for taxes. The right to enforce on demand payment of a particular claim essentially differs, both in availability and value, from a right to reduce the claim to judgment after protracted litigation, and particularly when, even after judgment, a further delay is

necessary to wait until there are funds in the treasury of the State to pay it.

It would excite surprise in any commercial community if a bank, whose bills purport on their face to be payable on demand, should declare that inasmuch as there were some forged notes upon it in circulation, therefore it would pay only such as the holder should judicially establish to be genuine. It has been decided that any unnecessary delay by a bank in examining its bills to determine their genuineness is equivalent to a refusal to redeem them. A bank resorting to such a flimsy pretext to evade payment would at once be pronounced insolvent, and be put into the hands of a receiver.

No weight is to be given to the recitals in the preamble of the act of Jan. 14, 1882, as to outstanding forged bonds and coupons. In the first place, the State, by reciting that various frauds have been committed with respect to some of her securities, cannot legislate to impair the obligation of her contracts. In the second place, we are justified in considering that these recitals are without foundation in fact. According to the established doctrine of this country, the most which can be attributed to a recital of facts in the preamble of an act is, that it was represented to the legislature that they existed. It is not the province of the legislature to find facts which shall affect the rights of others; that is the province of the judiciary. Says Cooley: "A recital of facts in the preamble of a statute may, perhaps, be evidence when it relates to matters of a public nature, as that riots or disorders exist in a certain part of the country; but when the facts concern the rights of individuals, the legislature cannot adjudicate upon them." Constitutional Limitations, 96.

Says the Court of Appeals of Kentucky: "The legislature, in all its inquiring forms, by committees, makes no issue, and in their discretion may or may not coerce the attendance of witnesses, or the production of records, and are frequently not bound by those rules of evidence applicable to an issue properly formed, the trial of which is an exercise of judicial power. Once adopt the principle that such facts are conclusive, or even *prima facie* evidence against private rights, and many individual controversies may be prejudged, and drawn from the

functions of the judiciary into the vortex of legislative usurpation. The appropriate functions of the legislature are to make laws to operate on future incidents, and not the decision of or forestalling rights accrued or vested under previous laws." *Elmendorff* v. *Carmichael*, 3 Litt. 473, 480. In the case from which this citation is made two acts were under consideration; the recital in the preamble of one was that a certain person was a naturalized citizen; the recital in the preamble of the other was of a letter of attorney and a conveyance by a third party; and the court said: " Such a preamble is evidence that the facts were so represented to the legislature, and not that they are really true." Although the language cited was used with reference to the preamble of a private statute, Sedgwick, in his Treatise on the Interpretation and Construction of Statutory and Constitutional Law, after quoting it, says: " This reasoning applies with as much force to public as to private statutes; and the Supreme Court of New York has well said that the legislature has no jurisdiction to determine facts touching the rights of individuals."

The weight usually accorded to a recital of matters of fact in the preamble of an act, that the facts were so represented to the legislature, cannot be allowed here; for the journals of the legislature of Virginia show that it had information when the act was passed, that the very opposite of the recitals was true, — that there were no forged or counterfeit bonds or coupons in existence, as therein stated. The journals may be referred to in order to show what was brought to the attention of the legislature, and those journals show that in 1880 the House of Delegates of Virginia appointed a committee to examine the office of the second auditor, who is the custodian of all papers relating to the debt of the State, to ascertain whether there were any forged or counterfeit bonds or coupons among them; and the committee reported that they were unable to find a single forged or counterfeit bond or coupon; and of the millions of dollars in coupons which had been paid into the treasury since 1871 all were accounted for, except coupons to the amount of $28,197. As it was the duty of the officer on receiving the coupons to cancel them, it must be presumed that these were properly cancelled by him at the time.

Again, in answer to a resolution of the House of Delegates, dated Jan. 9, 1882, the second auditor reported that no counterfeit or forged obligations, bonds, coupons, or certificates of the State had in any way come to his knowledge. And in answer to a resolution of the Senate of the 16th of January, 1882, the same auditor replied that he had no knowledge of any spurious or forged bonds or coupons issued or purporting to be issued under the Funding Act of March 30, 1871 ; and in an examination had into the matter, a clerk in the second auditor's office testified that he was familiar with the coupons issued under the act of March 30, 1871, and had handled about seven millions of them, and had never seen or heard of a counterfeit coupon. Another witness connected with the treasurer's office stated that he was familiar with the conduct and management of both the second auditor's office and of the treasurer's office, and that he had never heard of a duplicate or forged coupon.

In the third place, assuming that the $28,197 in coupons which could not be found in the auditor's office or accounted for had not been cancelled, but had been mislaid, lost, or stolen, the holders of other coupons ought not to be deprived of their use because the officers of the auditor's department had been neglectful of their duties. Assuming, also, against the fact, that there were forged and spurious coupons of the State, their existence did not warrant a rejection of such as are genuine. Although no officer questions their genuineness when tendered, the holder of them must make up an issue with the State to try the fact before a jury. The act was evidently designed to accomplish much more than the protection of the holders of genuine coupons. As justly said by one of the judges of the Court of Appeals : " Whilst its professed object in its title is to prevent frauds upon the Commonwealth and the holders of its securities, it greatly depreciates the value of those securities, and thereby impairs the obligation of contracts, under the vain pretext that it is necessary to protect the Commonwealth against frauds. It not only destroys or renders almost valueless the coupon, but also the coupon bonds, amounting to millions of dollars, issued by the State by authority of the act of March 30, 1871, and whose value depends upon the prompt payment of interest, of which assurance was given by the State to the

holders of those bonds by the stipulation in the contract that
the coupons at and after maturity should be receivable for all
taxes, debts, &c., due the State.   This statute prohibits revenue
officers to receive any coupons, though unquestionably genuine,
when tendered for and in discharge of taxes, &c., due the State,
and requires the bearer of the coupon so tendered to pay his
taxes in coin or other currency, which I think is plainly a
repudiation or annulment of the State's contract."

. The clause of the Constitution which declares that no State
shall pass any law impairing the obligation of contracts pro-
hibits legislation thus affecting contracts between the State and
individuals equally as it does contracts between individuals.
Indeed, the greater number of cases in which the protection of
the constitutional provision has been invoked against subse-
quent legislative impairment of contracts has been of those in
which the State was one of the contracting parties.   Where a
State enters the markets of the world and becomes a borrower,
she lays aside her sovereignty and takes upon herself the posi-
tion of an ordinary civil corporation, or of an individual, and is
bound accordingly.   *Davis* v. *Gray*, 16 Wall. 203 ; *Murray* v.
*Charleston*, 96 U. S. 432 ; *Hall* v. *Wisconsin*, 103 id. 5.

What, then, was the obligation of the contract entered into
between Virginia and her creditors under the Funding Act of
1871, so far as the interest coupons are concerned?   The con-
tract is that she will pay the amount of the coupon, and that it
shall, at and after maturity, be receivable for taxes, dues, and
demands of the State.   And by its receivability is meant that
it is to be taken by officers whom the State may authorize to
receive money for its dues whenever tendered for them.   By
the obligation of a contract is meant the means which the law
affords for its execution, the means by which it could, at the
time it was made, be enforced.   As said by the court in *Mc-
Cracken* v. *Hayward*, " The obligation of a contract consists in
its binding force on the party who makes it.   This depends on
the laws in existence when it is made ; these are necessarily
referred to in all contracts and form a part of them as the
measure of the obligation to perform them by the one party,
and the right acquired by the other."   2 How. 608, 612.

To the same purport and still more emphatic is the language

of the court in *Walker* v. *Whitehead*, 16 Wall. 314, 317 : " The laws which exist at the time and place of the making of a con-- tract, and where it is to be performed, enter into and form a part of it.    This embraces alike those which affect its validity, construction, discharge, and enforcement.    Nothing is more material to the obligation of a contract, than the means of its enforcement.    The ideas of validity and remedy are insepa- rable, and both are parts of the obligation which is guaranteed by the Constitution against impairment."

. In other words, to quote the language of Professor Pomeroy . in his work on Constitutional Law, " A party may demand that substantially the same remedial right appropriate to his con- tract when it was entered into shall be accorded to him when it is broken."    " Under our system of jurisprudence," says the same writer, " two forms of remedial right may result to the injured party upon the breach of a contract ; the one form ap- plying to a small number only of agreements, the other being appropriate to all.    The first is the right to have done exactly what the defaulting party promised to do, — the remedial right to a specific performance.    The other is compensatory, or the right to be paid such an amount of pecuniary damages as shall be a compensation for the injury caused by the failure of the defaulting party to do exactly what he promised to do.    Both of these species of remedial rights must be pursued by the aid of the courts.    In both the existence of the contract and of the breach must be established.    These facts having been sufficiently as- certained, a decree or judicial order must be rendered, in the first case, that the defaulting party do exactly what he under- took to do, and in the second case, that the defaulting party pay the sum of money fixed as a compensation for his delict." Sects. 611, 612.

The receivability of the coupon, under the Funding Act of '1871, for taxes, dues, and demands, gave to it, as already said, its principal value.    At that time there was provided in the system of procedure of the State a remedy for the specific exe- cution of the contract, by which this receivability could be en- forced.    The legislation of Jan. 14 and April 7, 1882, deprives the holder of the coupon of this remedy, and in lieu of it gives him the barren privilege, after paying the taxes, of suing

in a local court to test before a jury the genuineness of the coupon and its legal receivability for them; and in case he establishes these facts, of having a judgment to that effect certified to the treasurer of the Commonwealth, and the amount paid refunded out of money in the treasury, if there be any. To recover this judgment he must pay the costs of the proceeding, including the fees of witnesses and jurors, and of the clerk, sheriff, and other officers of the court. This is a most palpable and flagrant impairment of the obligation of the contract. No legislation more destructive of all value to the contract is conceivable, unless it should absolutely and in terms repudiate the coupon as a contract at all. It is practical repudiation.

In *Bronson* v. *Kinzie* this court, speaking by Chief Justice Taney, said: "It is difficult, perhaps, to draw a line that would be applicable in all cases between legitimate alterations of the remedy and provisions which, in the form of remedy, impair the right. But it is manifest that the obligation of a contract, and the rights of a party under it, may in effect be destroyed by denying a remedy altogether, or may be seriously impaired by burdening the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing. And no one, we presume, would say that there is any substantial difference between a retrospective law, declaring a particular contract or class of contracts to be abrogated and void, and one which took away all remedy to enforce them, or incumbered it with conditions that rendered it useless or impracticable to pursue it." 1 How. 311, 317.

In *Planters' Bank* v. *Sharp* this court said: "One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force." 6 id. 301, 327.

In *Murray* v. *Charleston* the court cited with approval the language of a previous decision to the effect that a law which alters the terms of a contract by imposing new conditions, or dispensing with those expressed, impairs its obligation; and added, speaking by Mr. Justice Strong, who recently occupied a seat on this bench, that "it is one of the highest duties of

this court to take care the prohibition [against the impairment of contracts] shall neither be evaded nor frittered away. Complete effect must be given to it in all its spirit." 96 U. S. 432, 448.

In *Edwards* v. *Kearzey* this court said, speaking by Mr. Justice Swayne, so lately one of our number : " The remedy subsisting in a State when and where a contract is made and is to be performed is a part of its obligation, and any subsequent law of the State which so affects that remedy as substantially to impair and lessen the value of the contract is forbidden by the Constitution, and is therefore void." 96 U. S. 595, 607. Mr. Justice Clifford, also lately sitting with us, in a concurring opinion in the same case, said : " When an appropriate remedy exists for the enforcement of the contract at the time it was made, the State legislature cannot deprive the party of such a remedy, nor can the legislature append to the right such restrictions or conditions as to render its exercise ineffectual or unavailing." Id: 608.

And only two terms ago, in *Louisiana* v. *New Orleans*, this court said, without a dissenting voice, that " the obligation of a contract, in the constitutional sense, is the means provided by law by which it can be enforced, by which the parties can be obliged to perform it. Whatever legislation lessens the efficacy of these means impairs the obligation. If it tend to postpone or retard the enforcement of the contract, the obligation of the latter is to that extent weakened." 102 id. 203, 206.

How can it be maintained, in the face of these decisions, that the legislation of Jan. 14 and April 7, 1882, does not impair the obligation of the contract under the Funding Act? It annuls the present receivability of the coupon ; it substitutes for the specific execution of the contract a protracted litigation ; and when the genuineness of the coupon and its legal receivability for taxes are judicially established, its payment is made dependent upon the existence of money in the treasury of the State. If the language of the act, declaring that, when the genuineness of the coupon and its receivability for taxes are established, the taxes paid by its holder shall be refunded out of the first money in the treasury in preference to other claims, be deemed a sufficient appropriation to authorize the treasurer

to pay out the money, contrary to what has just been decided with respect to language much more expressive in the legislation of Louisiana, of what avail can it be to the owner of the coupon if the treasurer refuse to refund the amount? There is no mode, according to the opinion of the majority, of coercing his action. No *mandamus* can issue, for that remedy and all compulsory process have been abolished.

Besides all this, as the coupons are mostly for small amounts, the costs of the suits to test their genuineness and receivability for taxes would be more than their value. Practically, the law destroys the coupons, and it was evidently intended to have that effect.

There is nothing at all similar to this, as seems to be intimated by the opinion of the majority, in the revenue system of the United States which forbids judicial proceedings to restrain the collection of a tax for its alleged invalidity, and only authorizes suit to recover back the money if paid under protest. Here the validity of the tax of Virginia is not assailed. The only question is, shall the officer of the State be required to receive in payment of the tax what she by her contract declared he should receive.

*Tennessee* v. *Sneed*, 96 U. S. 69, is cited as giving support to the decision in this case. I do not think that it gives it any support whatever. It does not sustain the doctrine that a State may abolish the right of *mandamus* to which a creditor at the time of the contract was entitled, as a mode of specifically enforcing it. The facts of the case are these: In 1838 the legislature of Tennessee passed a law, with respect to the bills and notes of the Bank of Tennessee, declaring that "the bills and notes of the said corporation, originally made payable, or which shall have become payable on demand in gold or silver coin, shall be receivable at the treasury, and by all tax-collectors and other public officers, in all payments for taxes or other moneys due the State."

The Supreme Court of the State decided that a proceeding by *mandamus* against an officer of the State to enforce the receipt of these bills for taxes was virtually a suit against the State, and could not be maintained prior to 1855, when an act was passed allowing suits to be brought against the State under

the same rules and regulations that govern actions between private parties. In 1865 this act was repealed. The creditor, when the contract was made, acquired, therefore, no right to the writ of *mandamus*, for it was not then an existing remedy; and so Mr. Justice Hunt, in delivering the opinion of the court, said: " The question discussed by Mr. Justice Swayne in *Walker* v. *Whitehead*, 16 Wall. 314, of the preservation of the laws in existence at the time of the making of the contract, is not before us. The claim is of a subsequent injury to the contract." And the court, after referring to the numerous cases of a change of remedies, says: " The rule seems to be that in modes of proceeding and of forms to enforce the contract, the legislature has the control, and may enlarge, limit, or alter them, provided that it does not deny a remedy, or so embarrass it with restrictions and conditions as seriously to impair the value of the right."

Here the original remedy possessed by the coupon-holder is abolished, and that which is given as a substitute is so embarrassed with conditions as to destroy the value of the contract.

In *Louisiana* v. *Pilsbury*, which was before us at the last term, the legislature of that State had passed a law prohibiting its courts from issuing a *mandamus* to compel the levy of a tax for the payment of bonds other than those issued under what was known as the premium-bond plan, thus cutting off the means of enforcing certain bonds held by the relator; and this court unanimously held that " the inhibition upon the courts of the State to issue a *mandamus* for the levy of a tax for the payment of interest or principal of any bonds except those issued under the premium-bond plan was a clear impairment of the means for the enforcement of the contract with the holders of the consolidated bonds. When the contract was made, the writ was the usual and the only effective means to compel the city authorities to do their duty in the premises, in case of their failure to provide in other ways the required funds. There was no other complete and adequate remedy. The only ground on which a change of remedy existing when a contract was made is permissible without impairment of the contract is, that a new and adequate and efficacious remedy be substituted for that which is superseded." 105 U. S. 278, 301.

That there is any adequate and efficacious remedy substituted for the one in existence when the Funding Act was adopted, cannot, it seems to me, be seriously affirmed. The remedy originally existing was effective. No officer could refuse to receive the coupon without subjecting himself to personal liability. After a tender no valid sale could be made for the taxes. And the creditor could invoke the compulsory process of the courts to secure a specific performance. Now all is changed. A law which practically destroys the value of the coupon is sustained. The officer is not bound to receive it, in the sense that he cannot be compelled to take it. He can enforce the payment of taxes in money; he can sell property, if necessary, to collect them; he can wholly ignore the coupon, unless the holder should foolishly consent to incur double the amount in costs to establish by a jury trial its genuineness and legal receivability for taxes.

I find myself bewildered by the opinion of the majority of the court. I confess that I cannot comprehend it, so foreign does it appear to be from what I have heretofore supposed to be established and settled law. And I fear that it will be appealed to as an excuse, if not justification, for legislation amounting practically to the repudiation of the obligations of States, and of their subordinate municipalities, — their cities and counties. It will only be necessary to insert in their statutes a false recital of the existence of forged and spurious bonds and coupons, — as a plausible pretext for such legislation, — and their schemes of plunder will be accomplished. No greater calamity could, in my judgment, befall the country than the general adoption of the doctrine that it is not a constitutional impairment of the obligation of contracts, to embarrass their enforcement with onerous and destructive conditions, and thus to evade the performance of them.

I am of opinion that the judgment of the Court of Appeals of Virginia should be reversed, and the cause remanded with instructions to award the *mandamus* prayed.

MR. JUSTICE HARLAN. I understand my brethren of the majority, in the opinion read by the Chief Justice, to declare:

That the bonds and coupons issued by Virginia, under the

Funding Act of March 30, 1871, constitute contracts within the meaning of that clause of the Federal Constitution which forbids a State from passing any law impairing the obligation of contracts;

That the holder of a coupon, so issued, against whom State taxes are assessed, is entitled under his contract to have it applied in payment of them, when it is offered for that purpose;

That the act of Jan. 14, 1882, in so far as it prevents the tax-collector from receiving it, when so offered, for any purposes except that of identification and verification, is in conflict with the Federal Constitution, and, therefore, void;

That, as a general rule, the laws applicable to the case, in force at the time and place of making a contract, including those which affect its validity, construction, discharge, and *enforcement*, enter into and form a part of the contract itself; and that while the State may alter or change existing remedies, it may not make such alterations and changes in the forms of action or the modes of proceeding as will impair substantial rights, or leave the party without an adequate and efficacious remedy for their enforcement;

I understand them, also, to reaffirm *Bronson* v. *Kinzie*, 1 How. 311, where, among other things, this court, speaking by Chief Justice Taney, said: "It is difficult, perhaps, to draw a line that would be applicable in all cases between legitimate alterations of the remedy, and provisions which, in the form of remedy, impair the right. But it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether; or may be seriously impaired by burdening the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing. And no one, we presume, would say that there is any substantial difference between a retrospective law declaring a particular contract or class of contracts to be abrogated and void, and one which took away all remedy to enforce them, or incumbered it with conditions that rendered it useless or impracticable to pursue it." p. 317.

I do not understand the court to throw any doubt upon, or in any degree to qualify the decision in, *State of New Jer-*

*sey* v. *Wilson*, 7 Cranch, 164, 166, where it is declared that the contract clause of the Constitution "extends to contracts to which a State is a party, as well as to contracts between individuals;" or in *Providence Bank* v. *Billings*, 4 Pet. 514, 560, where this court, speaking by Chief Justice Marshall, said that it had "been settled that a contract entered into between a State and an individual is as fully protected by the tenth section of the first article of the Constitution, as a contract between two individuals;" or in *Green* v. *Biddle*, 8 Wheat. 1, 84, where it was said, through Mr. Justice Washington, "that the Constitution of the United States embraces all contracts, executed or executory, whether between individuals, or between a State and individuals; and that a State has no more power to impair an obligation into which she herself has entered than she can the contracts of individuals;" or in *Woodruff* v. *Trapnall*, 10 How. 190, 207, where, speaking by Mr. Justice McLean, the court declared that "a State can no more impair, by legislation, the obligation of its own contracts, than it can impair the obligation of the contracts of individuals;" or in *Wolff* v. *New Orleans*, 103 U. S. 358, 367, where, speaking by Mr. Justice Field, this court unanimously held "that the prohibition of the Constitution against the passage of laws impairing the obligation of contracts applies to the contracts of States, and to those of its agents under its authority, as well as to contracts between individuals."

These propositions meet my hearty approval, as well because they rest upon a sound interpretation of the Constitution, as because they have been long established by the decisions of this court. But the difficulty I have is to reconcile the judgment in this case with these admitted propositions, and, therefore, I am, with my brother Field, constrained to dissent from so much of the opinion as maintains that the remedy provided by the act of Jan. 14, 1882, is adequate and efficacious for the protection and enforcement of the rights of the holders of the bonds and coupons, and substantially equivalent to that given when they were issued. On the contrary, the act, especially as subsequently modified, is, I take leave to say, a palpable and flagrant impairment of the obligation of the contract of Virginia, and, consequently, is unconstitutional and void. If it be

upheld in its application to the bonds and coupons issued under the Funding Act, it is difficult to perceive that the contract clause of the Constitution is of the slightest practical value for the preservation of the rights of parties dealing with a State. Indeed, the act, in its necessary operation, as directly and effectually impairs the commercial value of the bonds and the taxpaying power of the coupons thereunto annexed, as would a statute which in terms repudiated them, and forbade the receipt of the coupons, under any circumstances, for taxes or demands due to the Commonwealth.

What were the rights of the bondholder under the funding act, and other laws of Virginia in force when it was passed? This inquiry is fundamental, since those rights are entitled to judicial protection, either by the remedies existing when they accrued, or by such, if any, subsequently given, as may be adequate and efficacious to that end. Under the contract, Antoni was entitled, as all agree, to have his coupon received, when offered, in payment of his taxes. If, when so offered, it was refused, those laws provided him with the remedy of a *mandamus* from the Supreme Court of Appeals to compel the collector to accept it and cancel the taxes. This is conceded by my brethren of the majority, and no one claims that there was then any other remedy for the direct enforcement of the contract. And that remedy, it cannot be denied, was of value, since the taxes, until paid, constituted an incumbrance upon the taxpayer's property which he could not prudently overlook, and which he was entitled to have removed. It should be observed, in this connection, that section 2 of article 4 of the Constitution of Virginia, adopted in 1870, gave in express terms original jurisdiction to that court in cases of *mandamus.* Such were his contract rights under the act of 1871, and such was the remedy then given for their enforcement.

I proceed to inquire whether those rights have been impaired by the act of Jan. 14, 1882. The first section declares that the officer to whom coupons, issued under the act of 1871, are tendered in payment of taxes, debts, or demands due the State, "shall receive the same for the purpose of identification and verification." The second section provides that he shall, at the same time, require the taxpayer to pay his taxes

in coin, legal-tender notes, or national-bank bills, and, upon such payment, give him a receipt for the same; and, in case of a refusal so to pay, the officer is directed to collect the taxes as all other delinquent taxes are collected, that is, by levy and distraint.

It may be observed here that when the taxpayer elects to stand upon the terms of his contract, and refuses to pay his taxes in coin, legal-tender notes, or bank-bills, the act, curiously enough, does not direct the officer to return the coupons so tendered, but requires him to deliver them to the judge of the county court of the county or the hustings court of the city in which such taxes, debts, or demands are payable. Thereupon the taxpayer is " at liberty to file his petition in said county court against the Commonwealth," and have a jury impanelled to try whether the coupons are "genuine, legal coupons, which are legally receivable for taxes, debts, and demands," with right of appeal by either party to the Circuit Court and the Court of Appeals. " If it be finally decided in favor of the petitioner that the coupons tendered by him are genuine, legal coupons, which are legally receivable for taxes, and so forth, then the judgment of the court shall be certified to the treasurer, who, upon the receipt thereof, shall receive said coupons for taxes, and shall refund the money, before then paid for his taxes by the taxpayer, out of the first money in the treasury, in preference to all other claims."

The alteration made by the act of Jan. 14, 1882, of the remedy by *mandamus* is this: If a *mandamus* is applied for to any court of the Commonwealth, the collector shall make return " that he is ready to receive said coupons in payment of such taxes, debts, and demands as soon as they have been legally ascertained to be genuine, and the coupons which, by law, are actually receivable." Upon such return, the court shall require the taxpayer to pay his taxes to the proper officer, which being done, the taxpayer must file his coupons in court, which is directed to forward them to the county court of the county or the hustings court of the city where the taxes are payable, when an issue is framed, upon the trial of which the officer representing the State must require proof of the genuineness and legality of the coupons tendered.   A

right of appeal is given to the Circuit Court and the Supreme Court of Appeals. If the petitioner finally succeeds, then the court is required to issue a *mandamus* for the receipt of the coupons for the taxes assessed. Thereupon the treasurer of the Commonwealth must refund to the taxpayer the amoun'. theretofore paid by him out of any money in the treasury, in preference to all other claims. The Act of April 7, 1882, provides that no writ of *mandamus* shall issue from the Supreme Court of Appeals " in any case of the collection or attempt to collect revenue, or compel the collecting officers to receive anything in payment of taxes other than as provided in chap. 41, Acts of Assembly, approved January 26, 1882, or in any case arising out of the collection of revenue in which the applicant for the writ of process has any other remedy adequate for the protection and enforcement of his individual right, claim, and demand, if just."

This court waives any determination of the question whether the act of April 7, 1882, repeals so much of that of Jan. 14, 1882, as relates to *mandamus*. But, referring to the remedy given by the first, second, and third sections of the latter act, it holds that there is no substantial difference between the remedy given by those sections and the remedy given by *mandamus* in the same act; further, — which is vital in this case, — that the obligation of the contract is not impaired by the changes made, by the act of Jan. 14, 1882, in the remedies for its enforcement, in case the collector refuses to accept in payment of taxes coupons, when offered for that purpose.

Here is the radical difference between the majority of my brethren and myself. To my mind, — I say it with all respect for them, — it is so entirely clear that the change in the remedies has impaired both the obligation and the value of the contract, that I almost despair of making it clearer by argument or illustration.

It is conceded that under the contract the taxpayer is entitled to have his coupon received for his taxes when tendered, while under the act of Jan. 14, 1882, the collector is forbidden to so receive it; and the taxpayer, in order to protect his property against levy or distraint, and relieve it from the incumbrance created by the assessment of taxes, must pay

them in money, and then, if he wishes to get it back, prove to the satisfaction of twelve jurymen the genuineness and legal receivability of his coupons.

Under the contract and the laws in force when it was made, the taxpayer is entitled, in the first instance, to enforce the receipt of his coupons for taxes by *mandamus*, the sole remedy then given to effect that result; while under the subsequent legislation he is denied the right to that writ until he first pays his taxes in money, and then proves to the satisfaction of twelve jurymen that they are genuine coupons, and legally receivable for taxes.

Under the contract and the laws in force when it was made, the collector was not bound to resist an application for a *mandamus*, and it is not to be presumed that he would do so unless he doubted the genuineness of the coupon tendered in payment of taxes. If, however, he did so, he became liable to pay costs when the taxpayer succeeded; while under the act of Jan. 14, 1882, all discretion is taken from the collector, and, without liability to pay costs in any contingency, he is required, although he may know the coupon to be genuine and legally receivable for taxes, to decline receiving it until the taxpayer, having first paid his taxes in money, shall, to the satisfaction of twelve jurymen, prove it to be genuine.

Let me further illustrate some of these propositions. Suppose the taxpayer holds a bond for $100 issued under the act of 1871. It has thirty-four years to run, and the interest, payable semi-annually for the whole period at the rate of six per cent per annum, is evidenced by sixty-eight coupons of three dollars each. Under the laws in force when the contract was made, — a *mandamus* to compel the receipt of the first coupon, having established its genuineness and its receivability for taxes, — the collector and the Commonwealth would be estopped from raising any such question as to the remaining coupons attached to the same bond. But under the act of Jan. 14, 1882, the collector is required, as to all coupons presented, although known to be genuine, to collect money for the taxes for which they are tendered; and that money is paid into the treasury of the Commonwealth, not to be returned unless the taxpayer, upon every presentation of coupons for taxes, goes through

the jury trial prescribed by that act, obtains a verdict establishing their genuineness and legal receivability for taxes, and, in the event of an appeal, secures an affirmance of the judgment in his favor. The verdict and judgment as to one coupon do not, under that act, establish the genuineness of other coupons of the same bond. Thus it is demonstrably clear that the taxpayer, before he can enforce the receipt of the entire sixty-eight coupons of one bond for $100, may be required to have at least as many jury trials, covering precisely the same issues, as there may be occasions to use coupons in payment of taxes. Certainly the taxpayer, if not an attorney, cannot safely go before the jury without an attorney to represent him. It is, therefore, almost absolutely certain that his attorney's fee and the costs for each jury trial will be several times greater than the amount of the coupons involved. The result, then, is that he will lose more by presenting his coupons in payment of his taxes than by making an absolute gift of them to the Commonwealth.

And the remedy thus given by the statutes, passed after the contract was made, for the enforcement of the taxpayer's admitted right to have his coupon received for taxes, when offered, is pronounced to be adequate and efficacious, and not an impairment of the substantial rights given by the contract. My brethren, — distinctly admitting that the legislation of 1882 is in hostility to the State's creditors, and has impaired the commercial value both of the bonds and their coupons, — in effect and by a refinement of reasoning which I am unable to comprehend, hold, that such legislation does not burden the proceedings for the enforcement of the contract with any new conditions or restrictions inconsistent with or impairing its obligation. I cannot assent to such conclusion, believing, as I do, not only that it is in direct conflict with every adjudged case cited, either by the court or by my brother Field, but that the new remedy is adequate and efficacious, not for the preservation and enforcement, but for the destruction, of the contract. The holders of the bonds and coupons are placed by the legislation of 1882 in a position where it is useless and impracticable to pursue the remedies thereby given. To my mind this is so perfectly apparent that I should have deemed it impossible that

any different view could be entertained. It should be remembered that the court places its decision upon the ground that the change in the remedy has not, in legal effect, impaired the obligation of the contract, and not upon the ground that this suit is, within the meaning of the Federal Constitution, a suit against the State. Nor could it be placed upon the latter ground without overturning the settled doctrines of this court. *Davis* v. *Gray*, 16 Wall. 203 ; *Osborn* v. *Bank of the United States*, 9 Wheat. 738 ; *Board of Liquidation* v. *McComb*, 92 U. S. 531. It is a case in which "a plain official duty, requiring no exercise of discretion, is to be performed," and where performance in the mode stipulated by the contract is refused. In such cases, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance. *Board of Liquidation* v. *McComb, supra.* The acts of 1882, in their application to the bonds issued under that of 1871, are unconstitutional and void, because they impair the obligation of the contract between the parties. The way is, therefore, clear for the court to apply the remedy allowed by the statute when the contract was made. That remedy is, in law, unaffected by subsequent unconstitutional legislation. The defendant cannot plead such legislation as an excuse for the non-performance of a plain official duty, requiring no exercise of discretion, because, as held in *Board of Liquidation* v. *McComb, supra*, in accordance with settled principles, "an unconstitutional law will be treated by the courts as null and void;" and "if the officer plead the authority of an unconstitutional law for the non-performance or violation of his duty," that will not prevent a *mandamus* from being issued, or an injunction being granted when that is necessary to prevent threatened injury.

One word in this connection about *Tennessee* v. *Sneed*, 96 U. S. 69, to which the court refers as authority for the present decision. In the brief of the Attorney-General of Virginia the names of the justices who participated in that decision are given, and mine is placed among the number. This is an error into which counsel naturally fell by reason of the fact that there are cases in the same volume preceding *Tennessee* v. *Sneed*, and cases in the previous volume of our reports, in the decision of which I participated. In fact, however, that

case was determined, and the decision therein announced, before I became a member of this court.

Touching *Tennessee* v. *Sneed,* I may say that it does not militate against the views I have expressed. Upon the face of that decision it appears that this court, accepting as authority a decision of the Supreme Court of Tennessee, held that when the contract there in question was made, no remedy by *mandamus* was given against an officer of the State, charged with the collection of the revenue. And to show that the court did not have before it, and did not decide, any case of the impairment of the obligation of a contract through the withdrawal of existing remedies by subsequent legislation, I quote this language from the opinion of Mr. Justice Hunt, speaking for the court: "The question discussed by Mr. Justice Swayne, in *Walker* v. *Whitehead,* 16 Wall. 314, of the preservation of the laws in existence at the time of the making of the contract, is not before us. The claim is of a subsequent injury to the contract."

Without further elaboration, and referring to the authorities cited in the dissenting opinion of my brother Field, I content myself with saying that the principles of law applicable to the present cases are stated in *McCracken* v. *Hayward,* 2 How. 608, 612, 613, where this court, speaking by Mr. Justice Baldwin, said: " The obligation of a contract consists in its binding force on the party who makes it. This depends upon the laws in existence when it is made. These are necessarily referred to in all contracts, and form a part of them as the measure of the obligations to perform them by the one party, and the right acquired by the other. There can be no other standard by which to ascertain the extent of either than that which the terms of the contract indicate, according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract in favor of one party to the injury of the other; hence, any law which in its operation amounts to a denial or an obstruction of the rights accruing by a contract, though professing to act only on

the remedy, is directly obnoxious to the prohibition of the Constitution. . . . The obligation of the contract between the parties in this case was to perform the promises and undertakings contained therein; the right of the plaintiff was to damages for the breach thereof, to bring suit and obtain judgment, to take out and prosecute an execution against the defendant till the judgment was satisfied, pursuant to the existing laws of Illinois. These laws giving these rights were as perfectly binding on the defendant, and as much a part of the contract, as if they had been set forth in its stipulations in the very words of the law relating to judgments and executions."

Mr. Justice Story, in his Commentaries on the Constitution (vol. ii. p. 245), says that any deviation from the terms of a contract, by postponing or accelerating the performance it prescribes, or imposing conditions not expressed in the contract, or dispensing with the performance of those which are a part of the contract, impairs its obligation. And Judge Cooley, in his Treatise on Constitutional Limitations, summarizes, as I think correctly, the doctrines of numerous adjudged cases in this and other courts, when he says that " where a statute does not leave a party a substantial remedy, according to the course of justice as it existed at the time the contract was made, but shows upon its face an intention to clog, hamper, or embarrass the proceedings to enforce the remedy so as to destroy it entirely, and thus impair the contract, so far as it is in the power of the legislature to do it, such statute cannot be regarded as a mere regulation of the remedy, and is void" (p. 289), — language strikingly applicable to the legislation of Virginia.

By an act passed by the legislature of Virginia on the 7th of March, 1872, collectors of taxes were required to accept, in payment of taxes, nothing but gold and silver coin, United States treasury notes, and notes of national banks. But the Supreme Court of Appeals of that Commonwealth pronounced it to be unconstitutional as applied to the holders of bonds and coupons issued under the Funding Act of 1871. 22 Gratt. 933; 24 id. 169; 30 id. 137. Other statutes were subsequently passed plainly having for their object the destruction of the contracts made under and in pursuance of the Funding Act of 1871. The constitutional validity of that legislation was

involved in *Hartman* v. *Greenhow*, 102 U. S. 672. This court there, with only one dissenting voice, sustained the right of taxpayers, holding coupons issued under the act of 1871, to have them received in payment of taxes. Finally came the enactments of 1882, which have so changed the remedies existing when bonds were issued under the act of 1871 that taxpayers holding coupons of such bonds cannot use them in payment of taxes without expending more money to enforce a compliance with their contract than the coupons are worth.

I cannot agree that the courts of the Union are powerless against State legislation which is so manifestly designed to destroy contract rights protected by the Constitution of the United States.

Without stopping to speculate upon the disastrous consequences which would result both to the business interests and to the honor of the country if all the States should enact statutes similar to those passed by Virginia, I sum up what has been so imperfectly said by me : If, as is conceded, Antoni is entitled by the contract to have his coupon received in payment of taxes, when offered for that purpose, and if, as is also conceded in the opinion of the majority, he was entitled, by the laws in force when the contract was made, to the remedy of *mandamus* to compel the tax-collector to receive his coupons and discharge *pro tanto* his taxes, it is clear that the subsequent statute does impair the obligation of the contract, by imposing new and burdensome conditions, which not only prohibit the collector from receiving coupons in payment of taxes when offered, but require the taxpayer to pay his taxes in money, not to be returned to him unless, upon the occasion of each tender of coupons, he submits (without the possibility of recovering his costs of suit) to a jury trial, and proves to the satisfaction of twelve jurymen that the coupons tendered are genuine and legally receivable for taxes.

Upon the grounds stated I dissent from the judgment.

# INDEX.

ACCOUNT STATED.

    Unless objected to within a reasonable time, — and what constitutes such a reasonable time is a question of law, — an account rendered becomes an account stated, and cannot be impeached except for fraud or mistake. *Oil Company* v. *Van Etten*, 325.

ADMIRALTY. See *Appeal*, 2–4; *Maritime Law; Prize*.

    1. Under the act of Feb. 16, 1875, c. 77, a finding in a case of admiralty and maritime jurisdiction on the instance side of the Circuit Court has the effect of a special verdict in an action at law, and although no exceptions are filed, its sufficiency in connection with the pleadings to support the decree rendered is open to consideration on appeal. *The "Adriatic,"* 512.

    2. A sailing-vessel meeting a steamer should keep her course, unless it is manifest that she would thereby occasion a collision. Where, therefore, as in this case by her unnecessary changes of course, she misled and embarrassed an approaching steamer that was laboring to keep out of her way, and a collision occurred whereby she was sunk, whereas had she kept on the course she was sailing when first seen by the steamer, or adhered to her first new course afterwards taken, a collision would not have happened, — *Held*, that the steamer is not liable. *Id.*

AGENCY. See *Maritime Law; Railroad*, 1.

ALABAMA. See *Causes, Removal of*, 3.

ALE. See *Customs Duties*, 5.

ALIENS. See *Constitutional Law*, 1–4.

APPEAL. See *Admiralty*, 1; *Appeal Bond; National Banks*, 5.

    1. An appeal will not be dismissed by reason of the omission of certain persons who were parties to the suit in the court below, if they have no interest in maintaining or reversing the decree. *Basket* v. *Hassell*, 602.

    2. When persons summoned as garnishees in a libel in admiralty *in personam* are adjudged by the court to have a fund of the principal defendant in their hands and to pay it into court, and the libellant afterwards obtains a final decree against him with an award of exe-

APPEAL (*continued*).

cution against the fund in their hands, the first order is interlocutory, and they can appeal from the last decree only. *Cushing v. Laird*, 69.

3. Where, in a suit in admiralty by one insurance company against another upon a contract of reinsurance, it became essential for the libellant to show that the risk which it had assumed was the same as that insured against by the policy sued on, and the Circuit Court asserted the identity of the insurances, not in the findings of fact, but as a conclusion of law, the question on appeal is not whether that might be true as a presumption or inference of fact from the circumstances stated in the findings, but whether, upon the facts found, it must be true as a matter of law. *Sun Mutual Insurance Company v. Ocean Insurance Company*, 485.

4. The rule established in *United States v. Pugh*, 99 U. S. 265, as to findings of fact in cases from the Court of Claims, applies to appeals from decrees in admiralty, under the act of Feb. 16, 1875, c. 77. *Id.*

APPEAL BOND.

1. An appeal bond in an ordinary foreclosure suit in a court of the United States does not operate as security for the amount of the original decree; nor for the interest accruing thereon pending the appeal; nor for the balance due after applying the proceeds of the mortgaged premises; nor for the rents and profits, or the use and detention of the property pending the appeal; but only for the costs of the appeal, and the deterioration or waste of the property, and perhaps burdens accruing upon it by non-payment of taxes, and loss by fire if it be not properly insured. *Quære*, Is its mere depreciation in market value any cause of recovery on the bond. *Kountze v. Omaha Hotel Company*, 378.

2. An appeal bond in such a suit, instead of following the statutory requirement, "that the appellant shall prosecute his appeal to effect, and, if he fail to make his plea good, shall answer all damages and costs," superadds the words that he shall "pay for the use and detention of the property covered by the mortgage in controversy during the pendency of the appeal." In an action on the bond, — *Held*, that these words must be rejected, and the bond construed as having its ordinary and proper legal effect, the judge taking it having no right to exact such an addition to the condition of an appeal and *supersedeas*. *Id.*

3. This case distinguished from those in which official bonds, and bonds given to the government for the purpose of enjoying some office or privilege, have been sustained as contracts at common law. *Id.*

ARKANSAS.

1. The statute of Arkansas prescribing the manner in which property assigned for the benefit of creditors shall be sold is mandatory. *Jaffray v. McGehee*, 361.

ARKANSAS (*continued*).

2. An assignment made in the State is void if it vests in the assignee a discretion in conflict with the provisions of that statute, and authorizes him in effect to sell such property in a manner which they do not permit. *Id.*

ARMY. See *Officer of the Army.*

ASSIGNEE IN BANKRUPTCY. See *Bankruptcy.*

ASSIGNMENT. See *Equity*, 2; *Gift; Receiver*, 2.

ASSIGNMENT FOR CREDITORS. See *Arkansas.*

ATTACHMENT. See *Appeal*, 2; *Bankruptcy.*

ATTORNEY.

A rule was made by the Circuit Court of the United States for the Southern District of Florida, which, after reciting that it had come to the knowledge of the court that W., an attorney of the court, did, on a day specified, engage in and with an unlawful, tumultuous, and riotous gathering, he advising and encouraging thereto, take from the jail of Hillsborough County, and hang by the neck until he was dead, one John, otherwise unknown, thereby showing such an utter disregard and contempt for the law which, as a sworn attorney, he was bound to support, as shows him to be totally unfitted to occupy such position: thereupon cited him to appear at a certain time and show cause why his name should not be stricken from the roll. The attorney appeared, and answered, denying the charge in mass, and excepting to the jurisdiction of the court, (1) because there was no charge against him under oath, (2) because the offence charged was a crime by the laws of Florida for which he was liable to be indicted and convicted. The court overruled the exceptions, and called a witness who proved the charge, showing that the hanging took place before the court-house door, during a temporary recess of the court; thereupon the court made an order striking W.'s name from the roll. On motion made here for a *mandamus* to compel the judge of that court to reverse this order, and he having answered the rule, showing the special circumstances of the case, — *Held*, 1. That although not strictly regular to grant a rule to show cause why an attorney should not be struck off the roll, without an affidavit making charges against him, yet that, under the special circumstances of this case, the want of such affidavit did not render the proceeding void as *coram non judice.* 2. That the acts charged against the attorney constituted sufficient ground for striking his name from the roll. 3. That although, in ordinary cases, where an attorney commits an indictable offence, not in his character of attorney, and does not admit the charge, the courts will not strike his name from the roll until he has been regularly indicted and convicted, yet that the rule is not an inflexible one; that there may be cases in which it is proper for the court to proceed without such previous conviction; and that the present

ATTORNEY (*continued*).

case, in view of its special circumstances, the evasive denial of the charge, the clearness of the proof, and the failure to offer any counter proof, was one in which the court might lawfully exercise its summary powers. 4. That the proceeding to strike an attorney from the roll is one within the proper jurisdiction of the court of which he is an attorney, and does not violate the constitutional provision which requires an indictment and trial by jury in criminal cases; that it is not a criminal proceeding, and not intended for punishment, but to protect the court from the official ministration of persons unfit to practise as attorneys therein. 5. That such a proceeding is not an invasion of the constitutional provision that no person shall be deprived of life, liberty, or property without due process of law; but that the proceeding itself, when instituted in proper cases, is due process of law. 6. That, as the court below did not exceed its powers in taking cognizance of the case, no such irregularity occurred in the proceeding as to require this court to interpose by the writ of *mandamus*. *Ex parte Wall*, 265.

BANKRUPTCY. See *United States, Claims by and against.*

A State court, in which an action against a bankrupt upon a debt provable in bankruptcy is pending, must, on his application under sect. 5106 of the Revised Statutes, stay all proceedings to await the determination of the court in bankruptcy on the question of his discharge, unless unreasonable delay on his part in endeavoring to obtain his discharge is shown, or the court in bankruptcy gives leave to proceed to judgment for the purpose of ascertaining the amount due; even if an attachment has been sued out in the action more than four months before the commencement of the proceedings in bankruptcy, and has been dissolved by giving bond with sureties to pay the amount of the judgment which might be recovered. And if the highest court of the State denies the application, and renders final judgment against the bankrupt, he may, although he has since obtained his certificate of discharge, bring a writ of error, and his assignee may be heard here in support of the writ. *Hill* v. *Harding*, 631.

BANKS AND BANKING. See *National Banks.*

BEER. See *Customs Duties*, 5.

BILLS OF EXCHANGE AND PROMISSORY NOTES. See *Jurisdiction*, 12, 13.

BOND. See *Appeal Bond; Equity*, 4; *Louisiana; Municipal Bonds; Public Lands*, 2; *Virginia.*

BOTTLES. See *Customs Duties*, 5.

BOTTOMRY BOND. See *Maritime Law.*

BRIDGES. See *Navigable Waters.*

BURDEN OF PROOF. See *Maritime Law*, 2.

CASES AFFIRMED OR FOLLOWED.

The following, among others, expressly approved and affirmed: —

*Chy Lung* v. *Freeman*, 92 U. S. 259. See *People* v. *Compagnie Générale Transatlantique*, 59.

*Fosdick* v. *Schall*, 99 U. S. 235. See *Union Trust Company* v. *Souther*, 591.

*Harter* v. *Kernochan*, 103 U. S. 562. See *Pana* v. *Bowler*, 529.

*Hayward* v. *Andrews*, 106 U. S. 672. See *New York Guaranty Company* v. *Memphis Water Company*, 205.

*Henderson* v. *Mayor of New York*, 92 U. S. 275. See *People* v. *Compagnie Générale Transatlantique*, 59.

*Miltenberger* v. *Logansport Railway Company*, 106 U. S. 286. See *Union Trust Company* v. *Souther*, 591.

*Stark* v. *Starrs*, 6 Wall. 402. See *Missionary Society* v. *Dalles*, 336.

*United States* v. *Pugh*, 99 U. S. 265. See *Sun Marine Insurance Company* v. *Ocean Insurance Company*, 485.

CASES QUALIFIED OR OVERRULED.

*Shelton* v. *The Collector*, 5 Wall. 113. See *United States* v. *Phelps*, 320.

CAUSES, REMOVAL OF. See *Civil Rights*, 1; *Jurisdiction*, 6.

1. Section 643 of the Revised Statutes, which provides for removing to the Circuit Courts suits or criminal prosecutions commenced in a State court against " any officer appointed under or acting by authority of any revenue law, or any person acting under or by authority of such officer," applies to marshals of the United States, their deputies and assistants, when engaged in enforcing a revenue law of the United States. *Davis* v. *South Carolina*, 597.

2. Where such a prosecution is duly removed, the jurisdiction of the Circuit Court completely vests, and the subsequent action of the State court, forfeiting the recognizance of the defendant for his non-appearance there, is *coram non judice* and void. *Id.*

3. The Memphis and Charleston Railroad Company is made by the statutes of Alabama an Alabama corporation; and, although previously incorporated in Tennessee also, cannot remove into the Circuit Court of the United States a suit brought against it in Alabama by a citizen of Alabama. *Memphis and Charleston Railroad Company* v. *Alabama*, 581.

CEMETERY COMPANY. See *Corporation*, 3.

CHARITABLE GIFTS AND DEVISES. See *Will.*

William Russell, of St. Louis, " for the purpose of founding an institution for the education of youth in St. Louis County, Missouri," granted lands and personal property in Arkansas to John S. Horner and his successors, in trust " for the use and benefit of the Russell Institute of St. Louis, Missouri," with directions to the grantee to sell them, and to account for and pay over the proceeds " to Thomas Allen, President of the Board of Trustees of the said Russell Institute at St. Louis, Missouri," whose receipt should be a full discharge to the grantee. *Held,* that this was a charitable gift, valid against

CHARITABLE GIFTS AND DEVISES (*continued*).

the donor's heirs and next of kin, although the institution was neither established nor incorporated in the lifetime of the donor or of Allen. *Russell* v. *Allen*, 163.

CHICAGO RIVER. See *Navigable Waters*.

CHOSE IN ACTION. See *Equity*, 2; *Gift*.

CITIZENSHIP. See *Causes, Removal of*, 3; *Civil Rights*, 1; *Jurisdiction*, 5, 7–12.

CIVIL RIGHTS.

1. Where the highest court of the State had declared to be unconstitutional her statute whereby, because of their race and color, citizens of African descent were excluded from grand and petit juries, and it had further decided that the officer summoning or selecting jurors must disregard race or color, a person of that descent against whom a criminal prosecution was subsequently instituted in the State court has no just ground for declaring, in advance of a trial, that he was denied, or that in the State tribunals he cannot enforce, the equal civil rights secured to him as a citizen by the Constitution or the statutes of the United States. The case was not, therefore, removable to the Circuit Court, nor should the panel of petit jurors be set aside simply on the ground that it consisted wholly of white persons. *Bush* v. *Kentucky*, 110.

2. Where pursuant to such a statute, and before its unconstitutionality was so declared, the grand jurors were selected who found the indictment against the prisoner, a person of that descent, the court of original jurisdiction should, on his motion, set aside the indictment. *Id.*

CLAIMS BY AND AGAINST THE UNITED STATES. See *Contract*, 2; *Court of Claims*; *Pension*.

COLLATERAL SECURITY. See *Missouri*; *National Banks*, 1.

COLLECTOR OF CUSTOMS. See *Customs, Collector of*.

COLLISION. See *Admiralty*, 2.

COMITY. See *Jurisdiction*, 7–11.

COMMERCE. See *Constitutional Law*, 1–4; *Ferry*, 4; *Inspection Laws Navigable Waters*; *Wharves and Wharfage*.

COMMON CARRIERS. See *Railroad*.

COMPROMISE. See *Swamp and Overflowed Lands*, 3.

COMPTROLLER OF THE CURRENCY. See *National Banks*, 4.

CONFLICT OF LAWS. See *Municipal Bonds*, 10; *Will*, 3, 4.

CONGRESS. See *Inspection Laws*, 3; *Navigable Waters*; *Officer of the Army*.

CONSPIRACY. See *Equity*, 1.

CONSTITUTIONAL LAW. See *Attorney; Civil Rights; Corporation*, 3; *Ferry*, 4; *Inspection Laws*, 1, 3; *Louisiana; Municipal Bonds*, 2, 3, 11, 12; *Navigable Waters; Virginia; Wharves and Wharfage.*

1. The statute of New York of May 31, 1881, imposing a tax on every alien passenger who shall come by vessel from a foreign country to the port of New York, and holding the vessel liable for the tax, is a regulation of foreign commerce, and void. *Henderson* v. *Mayor of New York*, 92 U. S. 259, and *Chy Lung* v. *Freeman*, id. 275, cited, and the rulings therein made reaffirmed. *People* v. *Compagnie Générale Transatlantique*, 59.

2. The statute is not relieved from this constitutional objection by declaring in its title that it is to raise money for the execution of the inspection laws of the State, which authorize passengers to be inspected in order to determine who are criminals, paupers, lunatics, orphans, or infirm persons, without means or capacity to support themselves, and subject to become a public charge, as such facts are not to be ascertained by inspection alone. *Id.*

3. The words "inspection laws," "imports," and "exports," as used in cl. 2, sect. 10, art. 1, of the Constitution, have exclusive reference to property. *Id.*

4. This is apparent from the language of cl. 1, sect. 9, of the same article, where, in regard to the admission of persons of the African race, the word "migration" is applied to free persons, and "importation" to slaves. *Id.*

5. A. was convicted of murder in the first degree, and the judgment of condemnation was affirmed by the Supreme Court of Missouri. A previous sentence pronounced on his plea of guilty of murder in the second degree, and subjecting him to an imprisonment for twenty-five years, had, on his appeal, been reversed and set aside. By the law of Missouri in force when the homicide was committed this sentence was an acquittal of the crime of murder in the first degree; but before his plea of guilty was entered the law was changed, so that by force of its provisions, if a judgment on that plea be lawfully set aside, it shall not be held to be an acquittal of the higher crime. *Held*, that as to this case the new law was an *ex post facto* law, within the meaning of sect. 10, art. 1, of the Constitution of the United States, and that he could not be again tried for murder in the first degree. *Kring* v. *Missouri*, 221.

6. The history of the *ex post facto* clause of the Constitution reviewed in connection with its adoption as a part of the Constitution, and with its subsequent construction by the Federal and the State courts. *Id.*

7. The distinction between retrospective laws, which relate to the remedy or the mode of procedure, and those which operate directly on the offence, is unsound where, in the latter case, they injuriously affect any substantial right to which the accused was entitled under the law as it existed when the alleged offence was committed. *Id.*

8. Within the meaning of the Constitution, any law is *ex post facto* which

## CONSTITUTIONAL LAW (*continued*).

is enacted after the offence was committed, and which, in relation to it or its consequences, alters the situation of the accused to his disadvantage. *Id.*

## CONTRACT. See *Appeal Bond; Insurance; Railroad,* 2–6.

1. In construing contracts, a court may look not only to their terms, but to their subject-matter and the surrounding circumstances, and avail itself of the same light which at the time of making them the parties possessed. *Merriam* v. *United States,* 437.

2. Under the contract sued on in this case, *ante,* p. 437, the United States was not bound to receive a greater quantity of oats than that which is therein specifically mentioned. *Id.*

3. A. made a contract with B. to deliver a specified number of matched barrel-headings, to be properly piled on the land of B., who was to furnish a man to count them, as they were from time to time piled, in order to obtain an approximate estimate of the quantity piled, and thus to determine the amount of advances to A. under his contract; but the inspection and final count was to be made by an inspector appointed by B. at a point to which the latter shipped them. The property in the headings was to pass to B. on the delivery of them on his land. In a suit to recover the contract price of them, — *Held,* 1. That no error was committed by the trial court in admitting evidence of the counts by both parties of the whole number of single pieces of heading, and submitting to the jury the comparison between them, the court having ruled that the inspector's final count, which formed the basis of an estimate and average from which the number of matched headings was deduced, was, if made fairly and in the exercise of his best judgment, binding on the parties, unless its variance from the actual truth was too great to be accounted for by mere error of judgment in the matter of matching. 2. That although there was no evidence to show that all the pieces of heading shipped were in fact delivered at the point to which they had been sent, the jury were not bound to assume a loss in transportation in order to account for the discrepancy between the two counts. *Oil Company* v. *Van Etten,* 325.

## CORPORATION. See *Causes, Removal of,* 3; *Charitable Gifts and Devises; Missouri; National Banks; Railroad; Will,* 6–8, 11.

1. Restrictions imposed by the charter of a corporation upon the amount of property that it may hold cannot be taken advantage of collaterally by private persons, but only in a direct proceeding by the State. *Jones* v. *Habersham,* 174.

2. The provision of the Constitution of Georgia of 1868, which declares that " the General Assembly shall have no power to grant corporate powers and privileges to private companies " (with certain exceptions), " but it shall prescribe by law the manner in which such powers shall be exercised by the courts," does not take away from the General Assembly the power to amend the charters of existing corporations by modifying or enlarging their powers. *Id.*

CORPORATION (*continued*).

3. A cemetery company was incorporated in 1854 by an act of Congress which authorized it to purchase and hold ninety acres of land in the District of Columbia, and to receive gifts and bequests for the purpose of ornamenting and improving the cemetery; enacted that its affairs should be conducted by a president and three other managers, to be elected annually by the votes of the proprietors, and to have power to lay out and ornament the grounds, to sell or dispose of burial lots, and to make by-laws for the conduct of its affairs and the government of lot-holders and visitors; fixed the amount of the capital stock, to be divided among the proprietors according to their respective interests; and provided that the land dedicated to the purposes of a cemetery should not be subject to taxation of any kind, and no highways should be opened through it, and that it should be lawful for Congress thereafter to alter, amend, modify, or repeal the act. Presently afterwards thirty of the ninety acres were laid out as a cemetery, the cemetery was dedicated by public religious services, and a pamphlet was published, containing a copy of the charter, a list of the officers, an account of the proceedings at the dedication, describing the cemetery as "altogether comprising ninety acres, thirty of which are now fully prepared for interments," and the by-laws of the corporation, which declared that all lots should be held in pursuance of the charter. No stock was ever issued. But the owner of the whole tract, named in the charter as one of the original associates, and in the list published in the pamphlet as the president and a manager of the corporation, knowing all the above facts, and never objecting to the appropriation of the property as appearing thereby, for more than twenty years managed the cemetery, sold about two thousand burial lots, and gave to each purchaser a copy of the pamphlet, and a deed of the lot, signed by himself as president, bearing the seal of the corporation, and having the by-laws printed thereon. In 1877 Congress passed an act, amending the charter of the corporation, providing that its property and affairs should be managed, so as to secure the equitable rights of all persons having any vested interest in the cemetery, by a board of five trustees to be elected annually, three by the proprietors of lots owned in good faith upon which a burial had been made, and two by the original proprietors; and that of the gross receipts arising from the future sale of lots one-fourth should be annually paid by the trustees to the original proprietors and the rest be devoted to the improvement and maintenance of the cemetery. *Held*, that the act of 1877 was a constitutional exercise of the power of amendment reserved in the act of 1854; that the owner of the land was estopped to deny the existence of the corporation, the setting apart of the whole ninety acres as a cemetery, and the right of the lot-holders to elect a majority of the trustees; and that he was in equity bound to convey the whole tract to the corporation in fee, and to account to the corporation for three-fourths of the sums received by him from sales of lots since the act of 1877; and

**CORPORATION** (*continued*).

the corporation to pay him. one-fourth of the gross receipts from future sales of lots. *Close* v. *Glenwood Cemetery*, 466.

**COSTS.** See *Appeal Bond*, 1, 2.

**COTTON LACES AND INSERTINGS.** See *Customs Duties*, 6, 7.

**COUNTY.** See *Swamp and Overflowed Lands*, 3.

A. conveyed, March 5, 1859, to a county in Nebraska certain lands for a "poor-farm," and they were thereafter used as such. The county, pursuant to its agreement, made one cash payment, and for the remainder of the stipulated consideration gave its notes secured by mortgage, and payable respectively in one, two, three, and four years. A. assigned the notes to B. Some time thereafter, the Supreme Court of the State decided that, by the purchase of lands for such a purpose, a county could not be bound to pay at any specified time the purchase-money, or to secure it by mortgage upon them, but was limited to a payment in cash and to the levy of an annual tax to create a fund wherewith to pay the residue. A. and B., the notes remaining unpaid, filed, Sept. 10, 1877, a bill praying for a reconveyance and an accounting, or, should the county elect to retain the lands, then for a decree for the value of them. *Held*, 1. That in view of that decision, the contract being unauthorized only so far as it relates to the time and mode of paying the purchase-money, and the title to the lands having passed by the conveyance, the county holds that title as a trustee for the benefit of B., and that he is entitled to the relief prayed for. 2. That unless the sum due on account of the purchase-money, after a proper allowance shall be made as a compensation for a failure of A.'s title to a small part of the lands, be paid within a reasonable time, to be fixed by the court below, having reference to the necessity of raising the same by taxation, as prescribed and limited by the statute, the county be required to execute and deliver a deed, releasing to A. all the title acquired under his deed, and that he convey the same to B. 3. That the suit is not barred by the Statute of Limitations. *Chapman* v. *County of Douglas*, 348.

**COUPONS.** See *Louisiana; Municipal Bonds*, 5, 8–11; *Virginia*.

**COURT OF CLAIMS.** See *Customs, Surveyor of*.

1. A party who, under sect. 4 of the act of Aug. 5, 1861, c. 45, is entitled to the drawback there mentioned may, when payment thereof has been refused, maintain a suit therefor in the Court of Claims against the United States. *Campbell* v. *United States*, 407.

2. In computing the six years after his claim against the United States first accrues within which it may be filed in the Court of Claims, the period must be included when the claimant was unable to sue in that court by reason of the aid he gave to the rebellion. *Kendall* v. *United States*, 123.

3. The petition is bad on demurrer when it appears therefrom that the claimant's right of action against the United States is barred by the lapse of time. *Id*.

COURTS OF THE UNITED STATES. See *Court of Claims; District of Columbia*, 1; *Equity*, 3; *Jurisdiction; Louisiana*, 2.

CRIMINAL LAW. See *Attorney; Civil Rights; Constitutional Law*, 5–8; *Jurisdiction*, 6.

1. The counts of an indictment against the president of a national banking association for making such a false entry on its books as is punishable under sect. 5209 of the Revised Statutes are sufficient if they are in the form hereinafter set forth, *ante*, p. 656, as the offence is thereby alleged in apt terms, and with the requisite averments of time and place. *United States* v. *Britton*, 655.

2. The counts which charge his fraudulent purchase of shares of the capital stock of the association are bad if they either fail to state for whose use the purchase was made, or if they state that it was made for the use of the association, or if they do not aver that it was not made in order to prevent loss on some previously contracted debt. *Id.*

3. The counts which charge him with having wilfully misapplied the funds of the association should aver that he did so for the benefit of himself or some person or body other than the association, and with intent to injure or defraud the association or some other person or body corporate. *Id.*

4. The counts which charge his fraudulent purchase of the shares of stock, and allege that they were by him held " in trust for the use of said association, and that said shares were not purchased as aforesaid in order to prevent loss upon any debts theretofore contracted with said association in good faith," do not allege with sufficient certainty an offence under said sect. 5209. *Id.*

5. The purchase of stock in violation of sect. 5201, if made with intent to defraud, and by one or more of the officers of the bank named in said sect. 5209, is not a crime punishable under the latter section. *Id.*

6. An indictment for perjury against an officer of a national bank, for a wilfully false declaration or statement in a report made under sect. 5211 of the Revised Statutes is bad, if, prior to the passage of the act of Feb. 26, 1881, c. 82, his oath verifying the report was taken before a notary public appointed by a State, as such a notary had at that time no authority under a law of the United States to administer the oath. *United States* v. *Curtis*, 671.

CUSTOMS, COLLECTOR OF. See *Customs Duties*, 8.

1. Where a collector of customs brings a writ of error to review a judgment recovered against him for moneys exacted by and paid to him on entries, this court will, if it affirms the judgment, allow interest on it, under rule 23. *Schell* v. *Cochran*, 625.

2. In such a case, the " final judgment," the amount whereof is payable under sect. 989 of the Revised Statutes, is that rendered by the court below pursuant to the mandate of this court. *Id.*

CUSTOMS, SURVEYOR OF.

A. was surveyor of customs from June 13, 1872, to May, 1876, at Troy,
N. Y., which was a port of delivery, but not of entry, in the collec-
tion district of the city of New York. At various times during the
period from June 13, 1872, to June 22, 1874, there was a surveyor
of customs at the port of New York, which was a port of entry, and
there were surveyors of customs at two other ports in that district,
which were ports of delivery and not ports of entry. In accordance
with the uniform practice of the Treasury Department, under
sect. 1 of the act of March 2, 1867, c. 188, repealed by sect. 2 of the
act of June 22, 1874, c. 391, the Secretary of the Treasury distrib-
uted to the collector, naval officer, and surveyor at the port of New
. York, as such officers, and not as informers or seizing officers, one-
fourth part of the proceeds of the fines, penalties, and forfeitures
incurred at the port of New York between June 13, 1872, and June
22, 1874. A. made no question in regard to this practice until
March, 1874, and when informed, in June of that year, that the
department adhered to its construction of the act, he made no fur-
ther complaint until March, 1877. He sued the United States in
the Court of Claims in May, 1877, claiming that under said first
section he was entitled to share in said one-fourth equally with the
collector and the naval officer at the port of New York, and all the
surveyors in the district. The court rejected the claim. *Held*, that
the judgment was not erroneous. *Hahn* v. *United States*, 402.

CUSTOMS' DUTIES. See *Court of Claims*, 1; *Inspection Laws*.

1. Dutiable goods cannot lawfully be imported in the foreign mail under
the International Postal Treaty of Berne of Oct. 9, 1874. 19 Stat.
577. *Cotzhausen* v. *Nazro*, 215.

2. Such goods are, in the hands of the receiver of them from the post-
office, subject to seizure; and the fact that there was no intent on
the part of the sender or the receiver of them to defraud the United
States of the duty, does not render the customs officer liable to an
action for making the seizure. *Id.*

3. A claim for the appraisement of goods and the reduction of the duty
thereon, by reason of the damage which they sustained during the
voyage of importation, may be allowed, although not made until
after they were entered at the custom-house at their full invoice
value and the estimated duties thereon paid. *Shelton* v. *The Col-
lector*, 5 Wall. 113, so far as it conflicts with this ruling, is over-
ruled. *United States* v. *Phelps*, 320.

4. Section 2928, Rev. Stat., has exclusive reference to goods taken from
a wreck. *Id.*

5. Under schedules B and D of sect. 2504 of the Revised Statutes, ale
and beer imported in bottles are subject to a duty of thirty-five
cents per gallon, and a further duty of thirty per cent *ad valorem* is
imposed on the bottles. *Schmidt* v. *Badger*, 85.

.6. By schedule D of the act of July 30, 1846, c. 74, a duty of twenty-five
per cent *ad valorem* was imposed on "cotton laces, cotton insertings,"

**CUSTOMS DUTIES** (*continued*).

    and " manufactures composed wholly of cotton, not otherwise provided for." By sect. 1 of the act of March 3, 1857, c. 98, the duties on the articles enumerated in schedules C and D of the act of 1846 were fixed at twenty-four and nineteen per cent, respectively, " with such exceptions as are hereinafter made" By sect. 2 of the act of 1857, " all manufactures composed wholly of cotton, which are bleached, printed, painted, or dyed, and delaines," were transferred to schedule C. *Held*, that laces and insertings composed wholly of cotton, and bleached or dyed, were dutiable at twenty-four per cent, under the act of 1857. *Barber* v. *Schell*, 617.

    7. The designations qualified by the word " cotton," in the act of 1846, are designations of articles by special description, as contradistinguished from designations by a commercial name or a name of trade, and are designations of quality and material. *Id.*

    8. Under the act of March 2, 1799, c. 23, the collector of customs is not entitled to a fee for putting on an invoice a stamp or certificate as to the presentation of the invoice, or for an oath to an entry or for a jurat to such oath, or for his order to the storekeeper to deliver examined packages. *Id.*

**DAMAGES.** See *Equity*, 1; *Jurisdiction*, 3.

**DECREE.** See *Admiralty*, 1; *Appeal*, 1, 2, 4; *Appeal Bond*, 1; *District of Columbia*, 2; *Equity Pleading and Practice; Jurisdiction*, 2; *Municipal Bonds*, 9; *Prize*.

**DEED.** See *County; Trust Deed.*

**DELIVERY.** See *Contract*, 3; *Gift*, 2.

**DEMURRER.** See *Court of Claims*, 3.

**DEVISE.** See *Will.*

**DISTRICT ATTORNEY.** See *Patent for Land*, 1.

**DISTRICT OF COLUMBIA.**

    1. The Supreme Court of the District of Columbia is a court of the United States, and its judgment, when suit is brought thereon in any State of the Union, is, under the legislation of Congress, conclusive upon the defendant, except for such cause as would be sufficient to set it aside in the courts of the District. *Embry* v. *Palmer*, 3.

    2. A. recovered judgment in that court against B. and C., who, when sued thereon in a State court, filed their bill to enjoin the collection of so much thereof as they claimed was in excess of the amount due on the original cause of action, and alleged, as a ground of relief, matter available as a defence in the action at law, which they were not prevented from setting up by accident, or by the fraud of A., unconnected with the negligence of themselves or agents. The court perpetually enjoined A. from suing on the judgment on their paying into court that amount. They did so, and A. received it.

DISTRICT OF COLUMBIA (*continued*).

> The decree was affirmed by the court of last resort in the State. *Held*, 1. That, according to the law then in force in the District of Columbia, the bill not being sufficient to authorize the relief granted, the decree does not give the required effect to the judgment, and this court has jurisdiction to re-examine it on a writ of error. 2. That A., by accepting the amount so paid, is not estopped from prosecuting that writ. *Id.*

DONATIO CAUSA MORTIS. See *Gift*, 2.

DONATION. See *Municipal Bonds; Oregon*, 2.

DRAWBACK. See *Court of Claims*, 1.

DUE PROCESS OF LAW. See *Attorney*.

DUTIES. See *Customs Duties*.

ELECTIONS. See *Municipal Bonds*, 7, 8.

EQUITABLE ASSIGNMENT. See *Gift*, 1.

EQUITY. See *Trust Deed; Will*, 10.

> 1. Where the object of a suit in chancery is the recovery of the damages which the complainant alleges that he has sustained by reason of an unlawful and fraudulent conspiracy to cheat him out of his interest in an original invention, which is the subject-matter of the controversy, the bill should be dismissed, as his remedy is at law. *Ambler* v. *Choteau*, 586.
>
> 2. An assignee of a chose in action, or any other *cestui que trust*, cannot, merely on the ground that his interest is an equitable one, proceed in a court of equity to recover his demand. *Hayward* v. *Andrews*, 106 U. S. 672, cited upon this point and approved. *New York Guaranty Company* v. *Memphis Water Company*, 205.
>
> 3. The courts of the United States especially, in view of the act of Congress declaring that suits in equity shall not be sustained where there is a plain, adequate, and complete remedy at law, should enforce this rule. *Id.*
>
> 4. Certain parties holding bonds secured by a mortgage filed their bill to recover moneys alleged to be due on a contract which the city of Memphis made with the mortgagor, and which was assigned in the mortgage as part of the security for the bonds. *Held*, that the bill will not lie, the demand against the city being cognizable at law in the name of the mortgagor, and no special circumstances shown for a resort to equity. *Id.*

EQUITY PLEADING AND PRACTICE. See *District of Columbia*, 2; *National Banks*, 3.

> Pending a bill in equity against the owner of land to compel a conveyance of the title, subject to certain rights of his in the rents and profits, a receiver appointed in another suit against him, and to whom he had by order of court in that suit assigned his interest in the land, applied to be and was made a defendant, and answered,

**EQUITY PLEADING AND PRACTICE** (*continued*).

and also filed a cross-bill against both the original parties, which was afterwards ordered to be stricken from the files, with leave for him to apply for leave to file a cross-bill; but he never applied for such leave. The case was heard upon pleadings and proofs, and a final decree entered ordering the original defendant to convey to the complainant, and the complainant to account to him or his assigns for part of the rents and profits, and that this decree be without prejudice to the rights of the receiver. *Held*, that the receiver was not aggrieved. *Close* v. *Glenwood Cemetery*, 466.

**ESTOPPEL.** See *Corporation*, 3; *District of Columbia*, 2; *Missouri*, 1; *Prize*.

**EVIDENCE.** See *Contract*, 3; *Jury*; *Letters-patent*, 6; *Missouri*, 1; *National Banks*, 4; *Witness*.

In a suit against a municipal corporation to recover damages for injuries received from a fall caused by a defective sidewalk, which was in an unguarded condition, it is competent for the plaintiff to show that whilst it was in that condition other like accidents had occurred at the same place. *District of Columbia* v. *Armes*, 519.

**EXPORTS.** See *Constitutional Law*, 3; *Court of Claims*, 1; *Inspection Laws*.

**EX POST FACTO LAWS.** See *Constitutional Law*, 5–8.

**FALSE ENTRIES.** See *Criminal Law*, 1.

**FERRY.**

1. The fourth section of the act of the legislature of Illinois passed in 1819, touching a ferry across the Mississippi River from a place in Illinois to the city of St. Louis, Missouri, declares: "That the ferry established shall be subject to the same taxes as are now, or hereafter may be, imposed on other ferries within this State, and under the same regulations and forfeitures." *Held*, that the section provides for equality of taxation; that is to say, that the property of the ferry company shall be valued and taxed by the same rule as other like property, and be subject to the same exactions and forfeitures; but the company is not exempted from any license tax on its ferry-boats which the State or a municipal corporation thereunto authorized might impose. *Wiggins Ferry Company* v. *East St. Louis*, 365.

2. The power to license is a police power, although it may also be exercised for the purpose of raising revenue. *Id.*

3. A State has the power to impose a license fee, either directly or through one of its municipal corporations, upon the ferry-keepers living in the State, for boats which they own and use in conveying from a landing in the State passengers and goods across a navigable river to a landing in another State. *Id.*

4. The levying of a tax upon such boats, although they are enrolled and licensed under the laws of the United States, or the exaction of a license fee by the State within which the property subject to

FERRY (*continued*).

the exaction has its *situs*, is not a regulation of commerce within the meaning of the Constitution of the United States, nor is such tax or fee a duty of tonnage if it be not graduated by the tonnage of the boats or by the number of times they cross the river or land within the limits of the State. *Id.*

FINES, PENALTIES, AND FORFEITURES. See *Customs, Surveyor of; Ferry,* 1.

FORECLOSURE. See *Appeal Bond; Jurisdiction,* 12; *Receiver.*

FRAUD. See *Criminal Law,* 1–5; *Customs Duties,* 2; *Equity,* 1; *National Banks,* 2.

GARNISHMENT. See *Appeal,* 2.

GEORGIA. See *Corporation,* 2; *Will,* 2, 5, 6, 10.

GIFT. See *Charitable Gifts and Devises.*

1. A certificate of deposit in these terms: —

"EVANSVILLE NATIONAL BANK,

"EVANSVILLE, IND., Sept. 8, 1875.

"H. M Chaney has deposited in this bank twenty-three thousand five hundred and fourteen $\frac{70}{100}$ dollars, payable in current funds, to the order of himself, on surrender of this certificate properly indorsed, with interest at the rate of six per cent per annum, if left for six months. -

"$23,514.70.                                    HENRY REIS, *Cashier,*"

— may, as a subsisting chose in action, be the subject of a valid gift, if the person therein named indorse and deliver it to the donee, and thus vest in him the whole title and interest therein, or so deliver it, without indorsement, as to divest the donor of all present control and dominion over it, and make an equitable assignment of the fund, which it represents and describes. *Basket* v. *Hassell,* 602.

2. A *donatio mortis causa* must, during the life of the donor, take effect as an executed and complete transfer of his possession of the thing and his title thereto, although the right of the donee is subject to be divested by the actual revocation of the donor, or by his surviving the apprehended peril, or by his outliving the donee, or by the insufficiency of his estate to pay his debts. If by the terms and condition of the gift it is to take effect only upon the death of the donor, it is not such a *donatio,* but is available, if at all, as a testamentary disposition. Where, therefore, during his last illness, and when he was in apprehension of death, the person named in the above certificate made thereon the following indorsement: —

"Pay to Martin Basket, of Henderson, Ky.; no one else; then not till my death. My life seems to be uncertain. I may live through this spell. Then I will attend to it myself.

- "H. M. CHANEY,"

— and then delivered it to Basket, and died at his home in Tennessee, — *Held,* that Basket by such indorsement and delivery acquired no title to or interest in the fund. *Id.*

GUARANTY.  See *Railroad*, 6.

HYPOTHECATION.  See *Maritime Law.*

ILLINOIS.  See *Ferry*, 1; *Municipal Bonds*, 5–10; *Navigable Waters.*

IMPORTS.  See *Constitutional Law*, 3; *Court of Claims*, 1; *Customs Duties.*

INDIANS.  See *Oregon*, 1.

INDICTMENT.  See *Civil Rights; Criminal Law; Jurisdiction*, 6.

INDORSEMENT.  See *Gift; Jurisdiction*, 12.

INFRINGEMENT.  See *Letters-patent.*

INSANITY.  See *Witness*, 1.

INSOLVENT DEBTOR.  See *Bankruptcy; United States, Claims by and against.*

INSPECTION LAWS.  See *Constitutional Law*, 1–4.

1. Section 41 of chapter 346 of the laws of Maryland of 1864, as amended and re-enacted by chapter 291 of the laws of 1870, provides as follows: " After the passage of this act, it shall not be lawful to carry out of this State, in hogsheads, any tobacco raised in this State, except in hogsheads which shall have been inspected, passed, and marked agreeably to the provisions of this act, unless such tobacco shall have been inspected and passed before this act goes into operation; and any person violating the provisions of this section shall forfeit and pay the sum of three hundred dollars, which may be recovered in any court of law of this State, and which shall go to the credit of the tobacco fund: *Provided*, that nothing herein contained shall be construed to prohibit any grower of tobacco, or any purchaser thereof, who may pack the same in the county or neighborhood where grown, from exporting or carrying out of this State any such tobacco without having the same opened for inspection; but such tobacco so exported or carried out of this State without inspection shall in all cases be marked with the name in full of the owner thereof, and the place of residence of such owner, and shall be liable to the same charge of outage and storage as in other cases, and any person who shall carry or send out of this State any such tobacco, without having it so marked, shall be subject to the penalty prescribed by this section." Under that proviso, no requirement of the act of 1864 is dispensed with, except that of having the hogshead opened for inspection. The hogshead must still be delivered at a State tobacco warehouse, and there numbered and recorded and weighed and marked, and be found to be of the dimensions prescribed by statute, and to have been packed and marked as required. *Held*, 1. That said section 41, as so amended and re-enacted, is not, in its provisions as to charges for outage and storage, in violation of clause 2 of section 10 of article 1 of the Constitution of the United States, as respects any impost or duty imposed by it

**INSPECTION LAWS** (*continued*).

on exports, or of the clause of section 8 of article 1 which gives power to the Congress "to regulate commerce with foreign nations and among the several States;" nor is it a regulation of commerce or unconstitutional, as discriminating between the State buyer and manufacturer of leaf tobacco and the purchaser who buys for the purpose of transporting the tobacco to another State or to a foreign country. or as discriminating between different classes of exporters of tobacco.  2. That the charge for outage, thereby made, is an inspection duty, within the meaning of the Constitution, and it is not foreign to the character of an inspection law to require every hogshead of tobacco to be brought to a State tobacco warehouse.  3. That dispensing with an opening for inspection of the hogsheads mentioned in the proviso does not, in view of the other provisions of the tobacco inspection statutes of the State, deprive those statutes of the character of inspection laws.  *Turner* v. *Maryland*, 38.

2. The characteristics of inspection laws considered, with references to the legislation of the American colonies and the States on the subject.  *Id.*

3. *Quære*, Is it not exclusively the province of Congress to determine whether a charge or duty, under an inspection law, is or is not excessive.  *Id.*

4. The charge for outage in this case appears to be a charge for services properly rendered.  *Id.*

**INSURANCE.**  See *Appeal*, 3.

1. It is the duty of the assured to communicate all material facts, and he cannot urge as an excuse for his omission to do so that they were actually known to the underwriters, unless the knowledge of the latter was as full and particular as his own information.  *Sun Mutual Insurance Company* v. *Ocean Insurance Company*, 485.

2. The exaction of information in some instances may be greater in a case of reinsurance than as between the parties to an original insurance.  In the former, the party seeking to shift the risk he has taken is bound to communicate such information within his knowledge as would be likely to influence the judgment of an underwriter.  *Id.*

**INTEREST.**  See *Appeal Bond*, 1; *Customs, Collector of*, 1; *Jurisdiction*, 4; *Louisiana; Municipal Bonds*, 10; *National Banks*, 4; *Tax and Taxation.*

**INVENTION.**  See *Equity*, 1; *Letters-patent.*

**IOWA.**  See *Swamp and Overflowed Lands*, 3.

**JUDGMENT.**  See *Customs, Collector of*, 2; *District of Columbia.*

A judgment entered by consent for a specific amount, subject to any credits which the defendant may produce vouchers for, is good as between the parties themselves and their privies.  *Burgess* v. *Seligman*, 20.

**JUDICIAL DISCRETION.**  See *Receiver*, 1.

JURISDICTION.

I. Of the Supreme Court. See *District-of Columbia*, 2; *Missouri*, 2; *Railroad*, 5.

1. This court has jurisdiction to re-examine the judgment of the Supreme Court of a State, rendered adversely to the right and title which a party to the suit specially sets up to land under a patent issued by the United States to another under whom he claims. *Baldwin* v. *Stark*, 463.

2. This court has no jurisdiction to re-examine the judgment of a State court recognizing as valid the decree of a foreign court annulling a marriage. *Roth* v. *Ehman*, 319.

3. This court will not re-examine the order of the Circuit Court, refusing to set aside the verdict upon the ground that the jury awarded excessive damages. *Wabash Railway Company* v. *McDaniels*, 454.

4. Where a cause has been finally disposed of here, by the dismissal of the writ of error, this court has no power, at a subsequent term, to alter its judgment to one of affirmance, although, if there had been a judgment of affirmance, interest during the pendency of the writ would have been allowed on the amount of the judgment below, and in the judgment of dismissal no such interest was allowed. *Schell* v. *Dodge*, 629.

II. Of the Circuit Court. See *Attorney*; *Causes, Removal of*; *Wharves and Wharfage*, 5.

5. The Circuit Court cannot take jurisdiction of a suit removed from a State court under the third subdivision of sect. 639 of the Revised Statutes, on account of "prejudice or local influence," unless all the necessary parties on one side of the suit are citizens of different States from those on the other. *Myers* v. *Swann*, 546.

6. Where the Circuit Court quashes an indictment, found against the prisoner in a State court, wherefrom the cause was on his petition removed, it has no jurisdiction to proceed against him for the crime against the State wherewith he was charged. *Bush* v. *Kentucky*, 110.

III. In General. See *Attorney*; *Louisiana*, 2.

7. The courts of the United States, in the administration of State laws in cases between citizens of different States, have an independent jurisdiction co-ordinate with that of the State courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. *Burgess* v. *Seligman*, 20.

8. Where, however, by the course of the decisions of the State courts, certain rules are established which become rules of property and action in the State, and have all the effect of law, — especially with regard to the law of real estate and the construction of State constitutions and statutes, — the courts of the United States always regard such rules as authoritative declarations of what the law is. But where the law has not been thus settled, it is their right and duty to exercise their own judgment; as they also always do in reference to the doctrines of commercial law and general jurisprudence: and when contracts and transactions have been entered into and rights

JURISDICTION (*continued*).

have accrued thereon under a particular state of the decisions of the State tribunals, or when there has been no decision, the courts of the United States assert the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be given by the State courts after such rights have accrued. *Id.*

9. But even in such cases, for the sake of harmony and to avoid confusion, the courts of the United States will lean towards an agreement of views with the State courts, if the question seems to them balanced with doubt. *Id.*

10. Acting on these principles of comity, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the State courts. *Id.*

11. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the States in controversies between citizens of different States was to institute independent tribunals which it might be supposed would be unaffected by local prejudices and sectional views, it is their duty to exercise an independent judgment in cases not foreclosed by previous adjudication. *Id.*

12. The indorsee of " a promissory note negotiable by the law merchant," which the maker secured by a mortgage of land to the payee, is not precluded from maintaining a foreclosure suit in a court of the United States by the fact that the maker and the payee are citizens of the same State. *Tredway* v. *Sanger*, 323.

13. Where, in an action brought in a court of Virginia against an indorser of promissory notes, payable August, 1861, at Alexandria in that State, the point in controversy being as to the sufficiency of the notices of dishonor, and the court decided in substance that by the general principles of commercial law, if, during the late civil war, he abandoned his residence in loyal territory and went to reside permanently within the Confederate lines before the note matured, a notice left at his former residence was not sufficient to charge him, if his change of residence was known, or by the exercise of reasonable diligence might have been known, to the holder of the note when it matured, — *Held*, that no Federal question was raised by the decision. *Allen*.v. *McVeigh*, 433.

14. Where the plaintiff's prayer for instructions relates also to the Virginia ordinance of secession and the proclamations of the President of April, 1861, and Aug. 16, 1861, but, as the case stood upon the evidence, neither of them was involved, and no title, right, privilege, or immunity thereunder was claimed by either party, — *Held*, that the prayer was properly refused; and, the only Federal question thereby sought to be raised having been correctly disposed of, this court cannot consider the other errors assigned. *Id.*

JURY. See *Civil Rights;* *Contract*, 3; *Jurisdiction*, 3; *Railroad*, 4.

The jury may be controlled in their determination of a question by a peremptory instruction, if the testimony is of such a conclusive

JURY (*continued*).

character as would compel the court, in the exercise of a sound legal discretion, to set aside a verdict if one were returned in opposition to such testimony. *Montclair* v. *Dana*, 162.

LAND GRANTS. See *Oregon; Patent for Land; Pre-emption; Public Lands; Swamp and Overflowed Lands.*

LAW AND FACT. See *Account Stated; Appeal*, 3, 4; *Jury; Maritime Law*, 2; *Railroad*, 4.

LEGACY. See *Will*.

LETTERS--PATENT.
1. It is the duty of the court to dismiss 'a suit brought to restrain the infringement of letters-patent, where the device or contrivance for which they were granted is not patentable, although such defence be not set up. *Slawson* v. *Grand Street Railroad Company*, 649.
2. The invention described in reissued letters-patent No. 4240, granted to John B. Slawson, Jan. 24, 1871, is not patentable, as it is confined to putting in the ordinary fare-box used on a street car an additional pane of glass opposite to that next the driver, so that the passenger can see the interior of the box. The letters are therefore void. *Id.*
3. Letters-patent No. 121,920, granted to Elijah C. Middleton, Dec. 12, 1871, are void. The fare-box, the head-light of the car, and the reflector are the elements of the contrivance described in the specification and claim for lighting the interior of the box at night, and they are old. What is covered by the letters is not patentable, as it is simply making in the top of the box an aperture through which the rays of the head-lamp are turned by means of a reflector. *Id.*
4. Letters-patent granted to Edwin L. Brady, Dec. 17, 1867, for an improved dredge-boat for excavating rivers, are invalid for want of novelty and invention. *Atlantic Works* v. *Brady*, 192.
5. The design of the patent laws is to' reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. It was never their object to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. *Id.*
6. Although letters-patent are not set up by way of defence in an answer, yet if the invention patented thereby is afterwards put into actual use, their date will be evidence of that of the invention on a question of priority between different parties. *Id.*
7. One person receiving from another a full and accurate description of a useful improvement cannot appropriate it to himself; and letters-patent obtained by him therefor are void. *Id.*
8. Whether claim 3 of letters-patent No. 67,046, granted to Joseph L. Hall, July 23, 1867, for an " improvement in connecting doors and casings of safes," — namely, " 3. The conical or tapering arbors, 1,

**LETTERS-PATENT** (*continued*).

in combination with two or more plates of metal, in the doors and casings of safes and other secure receptacles, the arbors being secured in place in the plates by keys, 2, or in other substantial manner," — claims arbors which are tapped into two or more plates, or whether it excludes, as a part of it, screw-threads cut on the arbors, is immaterial in the present case, because, under the former view, the defendants are not shown to have used arbors with screw-threads on any part of the arbor within the plates, and, under the latter view, the claim is invalid. *Hall* v. *Macneale*, 90.

9. The whole invention is described in letters-patent No. 30,140, granted to Hall, Sept. 25, 1860, for an " improvement in locks," and a cored conical bolt with a screw-thread on it is shown in those letters. A solid conical bolt having existed, adding the screw-thread to it is not an invention. *Id.*

10. Solid conical bolts without screw-threads having been used in two safes made and sold by the inventor more than two years before his letters were applied for, the invention covered by claim 3 was in public use and on sale, with his consent and allowance, so as to make the claim invalid under sects. 7 and 15 of the act of July 4, 1836, c. 357, and sect. 7 of the act of March 3, 1839, c 88. *Id.*

11. Where, within four months before their expiration, letters-patent, covering a single claim for a combination of several elements, are reissued and extended, with the same description as before, but containing in addition to the original claim one for a combination of some of the elements only, the reissue is invalid as to the new claim. *Gage* v. *Herring*, 640.

12. Letters-patent for a combination of several elements are not infringed by using less than all the elements. *Id.*

13. In letters-patent for an improvement in cooling and drying meal during its passage from the millstones to the bolts, the claim was for the arrangement and combination of a fan, producing a suction blast; the meal chest; a spout forming a communication between the fan and the meal chest; a dust room above, to catch the lighter part of the meal thrown upwards by the current of air; a rotating spirally-flanched shaft in the meal chest, conveying the meal to the elevator; a similar shaft in the dust room, conveying the meal dust to the elevator; and the elevator, taking the meal to the bolts. Within four months before the expiration of the letters, they were reissued and extended, with two claims, the one a repetition of the original claim, and the other for the combination of the fan, the communicating spout, the meal chest with the conveying shaft in it, and the elevator, but omitting the dust room with its conveying shaft. *Held*, that the reissue is valid for the old claim only; and is not infringed by the use of the fan, spout, meal chest with its conveying shaft, elevator, and dust room, without any conveying shaft in the dust room, or other mechanism performing the same function. *Id.*

14. Reissued letters-patent No. 6673, granted to Mrs. P. Duff, E. A. Kitzmiller, and R. P. Duff, Oct. 5, 1875, for an " improvement in

LETTERS–PATENT (*continued*).

. wash-boards," on the surrender of original letters-patent No. 111,585, granted to Westly Todd, as inventor, Feb. 7, 1871, are not infringed by a wash-board constructed in accordance with the description contained in letters-patent No. 171,568, granted to Aaron J. Hull, Dec. 28, 1875. *Duff* v. *Sterling Pump Company*, 636.

15. In view of prior inventions, the claims of the letters-patent granted to Todd must be limited to the form which he shows and describes, namely, projections bounded by crossing horizontal and vertical grooves. They do not cover diamond-shaped projections bounded by crossing diagonal grooves. *Id.*

16. In the field of wash-boards made of sheet metal, with the surface broken into protuberances formed of the body of the metal so as to make a rasping surface, and to strengthen the metal by its shape, and to provide channels for the water to run off, Todd was not a pioneer. He merely devised a new form to accomplish those results; and his letters-patent do not cover a form which is a substantial departure from his. *Id.*

17. Claims 1, 8, 9, 11, 12, 14, 16, and 19 of reissued letters-patent No. 2224, granted April 10, 1866, to Reuben Hoffheins, for an "improvement in harvesters," the original, No. 35,315, having been granted to him May 20, 1862; and claims 1, 2, 6, 7, and 9 of reissued letters-patent No. 2490, granted Feb. 19, 1867, to him, for an "improvement in harvesters," the original, No. 40,481, having been granted to him Nov. 3, 1863, and reissued in two divisions, one, No. 1888, Feb. 28, 1865, and the other, No. 2102, Nov. 7, 1865; and No. 2490 having been issued on the surrender of No. 2102, — considered; and the difference between the specifications and the drawings of No. 35,315 and those of No. 2224, and that between the raking apparatus and rake-support of No. 2224 and those of the defendants, pointed out. *Hoffheins* v. *Russell*, 132.

18. There is no warrant in No. 35,315, for locating the rake-support, or any part of it, on the finger-beam, and as each of the above-named claims of No. 2224 has, as an element, either a rake, or a rake and reel, mounted on, or attached to, the cutting apparatus or the finger-beam, No. 35,315 could not lawfully be reissued with those claims. *Id.*

19. The defendants devised a new arrangement of rake, which made it possible to mount a rake-support on the heel of the finger-beam, where the rake-support of No. 2224 could not be mounted. The difference between the yielding belt-tightener of No. 2224 and their arrangement for driving the raking apparatus pointed out, and the latter held not to be a mechanical equivalent for the former. *Id.*

20. No. 40,481 negatives the idea of mounting the rake-post on the finger-beam, while an element in claim 1 of No. 2490 is the mounting of the raking mechanism on the finger-beam. In No. 2490, a driver's seat mounted on the main frame, so as to enable the driver to ride on the machine while the rake is in operation, is an element in claims 1 and 9, while the driver's seat in No. 40,481 is not, and

**LETTERS–PATENT**  (*continued*).

cannot be, in such a position that the driver can·ride on the seat while the rake is in operation. . *Id.*

21. The raking apparatus is an element in claims 2, 7, and 9 of No. 2490, and, in view of the differences between the two machines, in the construction of the raking mechanism and the arrangement and location of the rake-post, the rake of claims 2, 7, and 9 is to be construed to be such a rake, and one so arranged, on a rake-post so mounted, as is shown and described in the specification, and thus does not include the defendants' raking mechanism or rake-post. *Id.*

22. The driving device in claims 6 and 7 of No. 2490 held not to include the defendants' driving device, the former being an extensible tumbling shaft and the latter a chain belt with open links, and patentability or invention inhering only in the device, and not in its location. *Id.*

23. No cause of action is established against the defendants on either of the patents sued on. *Id.*

**LICENSE TAX.**  See *Ferry.*

**LIMITATIONS, STATUTE OF.**  See *County; Court of Claims*, 2, 3.

**LOUISIANA.**

1. By force of the act of the legislature of Louisiana, known as Act No. 3 of 1874, and the constitutional amendment adopted in that year, which provided that bonds should be issued under that act in exchange for valid outstanding bonds and warrants at the rate of sixty cents in the new bonds for one dollar of the old bonds and warrants, the State entered into a formal contract, the obligation of which it was forbidden by the Constitution of the United States to impair, and thereby stipulated with each holder of the new bonds so issued that an annual tax of five and one-half mills on the dollar of the assessed value of all the real and personal property in the State should be levied and collected, and the income therefrom applied solely to the payment of the bonds and coupons; that the tax levied by the act and confirmed by the Constitution should be a continuing annual tax until the bonds, principal and interest, were paid in full; that the appropriation of the revenue derived therefrom should be a continuing annual appropriation; and that no further authority than that contained in the act should be required to enable the taxing officers to levy and collect the tax, or the disbursing officers to pay out the money as collected in discharge of the coupons and bonds. *Louisiana* v. *Jumel*, 711.

2. After the said act of 1874 was passed, and the constitutional amendment sanctioning it was adopted, sundry parties, citizens of another State, exchanged their old bonds for new coupon bonds executed pursuant to the requirements of that act, and demanded of the proper State officers payment of the coupons which fell due Jan. 1, 1880, and the application thereto of the funds collected under the levy imposed by the act. Payment was refused solely on the ground that it was forbidden by the third article of the State Debt Ordi-

LOUISIANA (*continued*).

  nance of the new Constitution adopted July 23, 1879, *ante*, p. 715; and the treasurer claimed to hold the funds only for the purposes for which they were appropriated by the terms of that Constitution. The parties then brought in the State court of Louisiana a suit for a *mandamus* against the auditor and treasurer of state and the other members of the board of liquidation, requiring them to apply the funds in the treasury derived from the taxes levied or to be levied to the retirement of the bonds, and to execute the said act according to its intent and purpose. They also brought in the Circuit Court against the same defendants a suit praying for an injunction forbidding them to recognize as valid said ordinance, and to oppose the full execution of said act and the constitutional amendment. The suit for *mandamus* was removed to the Circuit Court. *Held*, 1. That the ordinance forbade the payment of the interest due January, 1880, and withdrew from the officers of the State the means of carrying her contract into effect. 2. That the execution of the contract cannot be enforced, nor the relief sought be awarded, in a suit to which she is not a party, but which is brought against officers, who are merely obeying the positive orders of the supreme political power of the State. 3. That at the time the bonds were issued or since no statute or judicial decision authorized a suit against Louisiana in her own courts, nor can she be sued in the courts of the United States by a citizen of another State. 4. That the money in her treasury is her property, held by her officers, not in trust for her creditors nor as their agents, but as her servants, and that the courts cannot control them in the administration of her finances, and thus oust the jurisdiction of the political power of the State. *Id.*

MAIL. See *Customs Duties*, 1, 2.

MANDAMUS. See *Attorney; Virginia*, 2, 3.

MARITIME LAW. See *Admiralty; Prize; Wharves and Wharfage*.

1. The master of a vessel can neither sell nor hypothecate the cargo, except in case of urgent necessity; and he can only lawfully do what is directly or indirectly for its benefit, considering the situation in which it has been placed by the accidents of the voyage. *The "Julia Blake,"* 418.

2. The necessity under which he acts is a question of fact, to be determined in each case by its circumstances; and upon his hypothecation of the cargo under his implied authority the lenders are chargeable with notice of the facts on which he appears to rely as his justification, and they must make inquiries and judge for themselves and at their own risk whether the owner, if present, would do or ought to do what, in his absence, the master is undertaking to do for him. Before there can be a recovery against the owner, it must be shown that the circumstances were such as to make it apparently proper for the master to do what he has done. To this extent the burden of proof is clearly on the lenders. *Id.*

MARITIME LAW (*continued*).

3. Where it appears that from the port where the vessel entered in distress the cargo could be forwarded by another vessel, and that it was for the interest of the shipper that it should be so forwarded, instead of being hypothecated to pay for the repairs of the vessel, and that they could not have been effected without an expense to him of very much more than it would cost to reclaim his property, pay all lawful charges on it, and forward it by another vessel, — *Held*, that the master had no authority to pledge the cargo without the consent of the shipper or the consignee. *Id.*

4. Although the bottomry bond cannot be enforced against the cargo, the latter will not be held in that suit for any charges which the vessel may have thereon, where a claim for them is not made in the libel. *Id.*

MARRIAGE. See *Jurisdiction*, 2.

MARYLAND. See *Inspection Laws*.

MASTER AND SERVANT. See *Railroad*, 1.

MEMPHIS AND CHARLESTON RAILROAD COMPANY. See *Causes, Removal of*, 3.

MINERAL LANDS. See *Patent for Land*, 2, 3.

MISSIONARY STATION. See *Oregon*, 1, 2.

MISSOURI. See *Constitutional Law*, 5.

1. By a statute of Missouri, stockholders of a corporation at its dissolution are liable for its debts; but it is provided that no person holding stock as executor, administrator, guardian, or trustee, and no person holding stock as collateral security, shall be personally subject to such liability, but the persons pledging such stock shall be considered as holding the same, and liable; and the estates and funds in the hands of executors, &c., shall be liable. *Held*, 1. That persons to whom a corporation pledges its stock as collateral security are within the exemption of the statute. 2. That certificates of the stock absolute on their face, issued in trust or as collateral security to a creditor, may be shown to be so held by evidence *in pais*. 3. That the person holding such stock in trust, or as collateral security, is not, by his voting thereon, estopped from showing that it belongs to the company, and that he holds it as collateral security. *Burgess* v. *Seligman*, 20.

2. The Supreme Court of Missouri, after the Circuit Court had decided this case, made a contrary decision against the same stockholders, at the suit of another plaintiff, holding that the clause of exemption in the statute does not extend to persons receiving from the corporation itself stock as collateral security. *Held*, that this court is not bound to follow the decision. *Id.*

MORTGAGE. See *Appeal Bond; County; Equity*, 4; *Jurisdiction*, 12; *Receiver; Trust Deed.*

MUNICIPAL BONDS.

1. The township of Montclair in the county of Essex, New Jersey, had authority to issue bonds to be exchanged for bonds of the Montclair Railway Company. *Montclair* v. *Ramsdell*, 147.

2. The Constitution of New Jersey provides: " To avoid improper influences which may result from intermixing in one and the same act, such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title." *Held*, 1. That this provision does not require the title of an act to set forth a detailed statement, or an index or abstract, of its contents; nor does it prevent uniting in the same act numerous provisions having one general object fairly indicated by its title. 2. That the powers, however varied and extended, which a township may exercise, constitute but one object, which is fairly expressed in a title showing nothing more than the legislative purpose to establish such township. *Id*.

3. The conflict between the Constitution and a statute must be palpable, to justify the judiciary in disregarding the latter upon the sole ground that it embraces more than one object, or that, if there be but one, it is not sufficiently expressed in the title. *Id*.

4. The holder of the bonds is presumed to have acquired them in good faith and for value. But if, in a suit upon them, the defence be such as to require him to show that value was paid, it is not, in every case, essential to prove that *he* paid it; for his title will be sustained if any previous holder gave value. *Id*.

5. The General Assembly of Illinois enacted, March 27, 1869, a statute as follows: " The acts of the city council of the city of Quincy, from June 2, 1868, to August 28, 1868, in ordering an election on the proposition to subscribe $100,000 to the capital stock of the Mississippi and Missouri River Air Line Railroad Company, and the subscription of said stock, and all other acts of said council in connection therewith, are hereby legalized and confirmed." In conformity with the vote of the citizens of Quincy cast at such an election, the council had, by an ordinance of Aug. 7, 1868, subscribed for that amount of said capital stock; but neither the election nor the subscription was authorized by law. After the statute took effect, negotiable coupon bonds were, by virtue of it and the ordinance, issued in the sum of $100,000 to the company, by the city, and the latter received therefore an equal amount of said stock. In a suit by A., a *bona fide* holder of coupons detached from the bonds, — *Held*, that they are valid obligations of the city. *Quincy* v. *Cooke*, 549.

6. The act of the General Assembly of Illinois, approved Feb. 24, 1869, amendatory of an act entitled " An Act to incorporate the Illinois Southeastern Railway Company," approved Feb. 25, 1867, removed the limitation of $30,000 imposed upon the amount which, by the latter act, " any town in any county under township organization is authorized and empowered to donate to said company." *Pana* v. *Bowler*, 529.

MUNICIPAL BONDS (*continued*).

7. The court reaffirms the ruling in *Harter* v. *Kernochan*, 103 U. S. 562, that the duly signed and countersigned township bonds, payable to the company or bearer, which recite that they are duly issued in compliance with the vote of the legal voters of the township, cast at an election held by virtue of the above-mentioned acts of Feb. 25, 1867, and Feb. 24, 1869, are valid in the hands of a *bona fide* holder. *Id.*

8. An irregularity in conducting the election will not defeat a recovery on the bonds, or on the coupons thereto attached, nor overcome the presumption that the plaintiff, in the usual course of business, became at their date the holder of them for value. *Id.*

9. A decree *in personam*, rendered by a court of the State of Illinois, declaring the bonds to be void, does not bind a non-resident holder of them who was not named as a party to the suit and did not appear therein, and who had no notice of the pendency thereof other than by a publication addressed to the "unknown holders and owners of bonds and coupons issued by the town of Pana." *Id.*

10. Coupons after their maturity bear interest at the rate prescribed by the law of the place where they are payable. *Id.*

11. Negotiable coupon-bonds were, without authority of law, issued in October, 1872, by a city in Nebraska, for the purpose of raising money wherewith to construct a high-school building within her limits. They were sold, and the proceeds applied accordingly. The legislature, by an act approved Feb. 18, 1873, *ante*, p. 571, legalized the proceedings of the city in the premises. The Constitution of the State then in force declares that "the legislature shall pass no special act conferring corporate powers," and that "no bill shall contain more than one subject, which shall be clearly expressed in its title." A purchaser of the bonds for full value, without notice of any informality in their issue, to whom the city paid the interest thereon for four years, brought suit to recover the amount of the coupons then due and unpaid. *Held*, 1. That as by force of the transaction the city was bound to refund the moneys he paid it in consideration of its void bonds, and as the act, by confirming them, merely recognizes the existence of that obligation, and provides a medium for enforcing it according to the original intention of the parties, no new corporate powers were thereby conferred. 2. That the title of the act is a full and apt description of its contents. *Read* v. *Plattsmouth*, 568.

12. Under the second section of the act of Nebraska approved Feb. 25, 1875, *ante*, p. 573, the bonds are valid obligations, and neither it nor the said act of Feb. 18, 1873, is in conflict with the Constitution of the State which was then in force. *Id.*

MUNICIPAL CORPORATION. See *Equity*, 4; *Evidence; Ferry*, 1, 3; *Municipal Bonds; Navigable Waters.*

**NATIONAL BANKS.** See *Criminal Law ; United States, Claims by and against.*

1. At the time of borrowing money from a national bank, A. delivered to it, as collateral security for the debt thereby created, the certificate of his shares of its capital stock. On his failure to pay at the stipulated time, the bank sold the stock at its full market value, and applied the entire proceeds to his credit. On the ground that sect. 5201 of the Revised Statutes prohibited a loan by the bank "on the security of the shares of its own capital stock," A. brought an action for the proceeds. *Held,* that he is not entitled to recover. *National Bank of Xenia* v. *Stewart*, 676.

2. Where the holder of shares of stock in a national bank, who is possessed of information showing that there is good ground to apprehend the failure of the bank, colludes with an irresponsible person, with the design of substituting the latter in his place, and thus escaping the individual liability imposed by the provisions of sect. 12 of the act of June 3, 1864, c. 106, and transfers his shares to such person, the transaction is a fraud on the creditors of the bank, and the liability of the transferrer to them is not thereby affected. *Bowden* v. *Johnson*, 251.

3. A bill in equity filed by the receiver of the bank against the transferrer and transferee to enforce such liability will lie where it is for discovery as well as relief, the transfer being good between the parties, and only voidable at the election of the complainant. *Id.*

4. A letter of the Comptroller of the Currency, addressed to the receiver, directing him to bring suit to enforce the personal liability of every person owning stock at the time the bank suspended, is sufficient evidence that the decision of the Comptroller touching such personal liability preceded the institution of the suit. The liability bears interest from the date of the letter. *Id.*

5. The decree below, dismissing the bill, was entered after a new receiver had been appointed. An appeal to this court was taken in the name of the old receiver, as the complainant, the new receiver becoming a surety in the appeal bond. In this court the new receiver was, on his motion, substituted as the complainant and appellant, without prejudice to the proceedings already had; and the motion of the appellees to dismiss the appeal was denied. *Id.*

**NAVIGABLE WATERS.** See *Ferry ; Wharves and Wharfage.*

1. The Chicago River and its branches, although lying within the limits of the State of Illinois, are navigable waters of the United States over which Congress, in the exercise of its power under the commerce clause of the Constitution, may exercise control to the extent necessary to protect, preserve, and improve their free navigation; but until that body acts, the State has plenary authority over bridges across them, and may vest in Chicago jurisdiction over the construction, repair, and use of those bridges within the city. *Escanaba Company* v. *Chicago*, 678.

NAVIGABLE WATERS (*continued*).

    2. There is nothing in the ordinance of July 13, 1787, or in the subsequent legislation of Congress, that precludes the State from exercising that authority. *Id.*

NEBRASKA. See. *County ; Municipal. Bonds,* 11, 12.

NEGLIGENCE. See *Railroad,* 1.

NEGROES. See *Civil Rights; Constitutional Law,* 4.

NEW JERSEY. See *Municipal Bonds,* 1–4.

NEW YORK. See *Constitutional Law,* 1, 2.

NON–RESIDENTS. See *Municipal Bonds,* 9; *Tax and Taxation.*

NOTARY PUBLIC. See *Criminal Law,* 6.

NOTICE. See *Jurisdiction,* 13; *Maritime Law,* 2; *Municipal Bonds,* 9; *Trust Deed,* 1.

OFFICER OF THE ARMY.

    The rank and pay of retired officers of the army are subject to the control of Congress. *Wood* v. *United States,* 414.

OFFICERS OF NATIONAL BANKS. See *Criminal Law.*

OFFICIAL BONDS. See *Appeal Bond,* 3; *Public Lands,* 2.

OREGON.

    1. Under the act of Aug. 14, 1848, c. 177, entitled " An Act to establish the territorial government of Oregon," a religious society acquired no title to public lands by reason of its occupation of them as a missionary station among the Indian tribes, unless such occupation actually existed at that date. *Missionary Society* v. *Dalles,* 336.

    2. Where, therefore, a religious society appropriated certain lands in the Territory of Oregon, erected improvements thereon and occupied them for such a missionary station, but its occupation ceased before that date, and a portion of them, after the town-site acts took effect, was, pursuant to their provisions, entered and paid for, and another portion was claimed by a party who had fully complied with the requirements of the act of Sept. 27, 1850, c. 76, commonly called the Donation Act, — *Held,* that the society to which by reason of such occupation a patent had been issued held the title to such portions in trust for the parties claiming respectively under the donation and the town-site acts. *Id.*

    3. Prior to the said act of Sept. 27, 1850, no person could, by entry or pre-emption settlement, acquire as against the United States any right or title to public land in Oregon. *Stark* v. *Starrs,* 6 Wall. 402, cited upon this point and approved. *Id.*

PACIFIC RAILROAD ACTS. See *Patent for Land,* 2.

PATENT. See *Letters-patent.*

PATENT FOR LAND. See *Jurisdiction*, 1; *Oregon*, 2; *Pre-emption; Public Lands.*

1. Where a bill was filed in the Circuit Court by the District Attorney in the name of the United States, to vacate a patent for lands, but no objection touching his authority to bring the suit was made, and a duly certified copy of a letter whereby he was directed by the Attorney-General to institute the requisite proceedings was filed here, — *Held*, that the decree for the complainant will not be reversed on such an objection raised here for the first time. *McLaughlin* v. *United States*, 526.

2. The patent in question, bearing date May 31, 1870, and issued to a railroad company, in professed compliance with the terms and conditions of the grant made by the acts commonly known as the Pacific Railroad Acts, covers lands which, the bill alleges, contain valuable quicksilver and cinnabar deposits, and were known to be "mineral lands" when the grant was made and the patent issued. This court, being satisfied that the material allegations of the bill are true, that as early as 1863 and since cinnabar was mined upon the lands, and that at the time of the application for a patent their character was known to the defendant, the agent of the company, who now claims them under it, affirms the decree cancelling the patent and declaring his title to be null and void. *Id.*

3. *Quære*, What extent of mineral, other than coal and iron, found in lands will exclude them from the said grant; and can the United States maintain a suit to set aside a patent, if, before it was issued, the lands therein mentioned were not known to be mineral; and, if so, what are the rights of innocent purchasers from the patentee. *Id.*

PENSION.

By a special act, B. was allowed a pension of fifty dollars per month, which was paid to him until he claimed and received, under a subsequent general act, seventy-two dollars per month. *Held*, that he is not entitled to take under both acts. *United States* v. *Teller*, 64.

PERJURY. See *Criminal Law*, 6.

PERPETUITY. See *Will*, 9.

PLEADING. See *Admiralty*, 1; *Court of Claims*, 3.

POLICE POWER. See *Ferry*, 2.

POOR-FARM. See *County.*

POST-OFFICE. See *Customs Duties*, 1, 2.

PRACTICE. See *Admiralty*, 1; *Appeal; Attorney; Equity Pleading and Practice; Evidence; Jurisdiction; Jury; Letters-patent*, 1, 6; *National Banks*, 5; *Witness*, 2.

PRE-EMPTION. See *Oregon; Patent for Land; Public Lands.*

1. Where the Land Department rejected the claim of a party to preempt a tract of public land, it appearing from the evidence sub-

**PRE–EMPTION** (*continued*).

mitted that he had previously exercised the "pre-emptive right," — *Held*, that the finding of that fact by the department is conclusive. *Baldwin* v. *Stark*, 463.

2. A person is not entitled, under existing statutes, to more than one such "pre-emptive right," nor, after filing a declaratory statement for one tract, can he file such a statement for another tract. *Id.*

**PRIORITY OF PAYMENT.** See *Trust Deed*, 1; *United States, Claims by and against*.

**PRIZE.**

A final decree of acquittal and restitution to the only claimant in a prize cause determines nothing as to the title in the property, beyond the question of prize or no prize; and another person, who actually conducts the defence in the prize cause in behalf and by consent of the claimant, without disclosing his own title under a previous bill of sale from the claimant, is not estopped to contest the claimant's title in a subsequent suit brought by creditors attaching the property or its proceeds as belonging to the claimant. *Cushing* v. *Laird*, 69.

**PUBLIC LANDS.** See *Oregon; Patent for Land; Pre-emption · Swamp and Overflowed Lands*.

1. The local land-officers are not required to meet and jointly consider the proof of settlement and cultivation offered by claimants under the pre-emption laws. *Potter* v. *United States*, 126.

2. In his accounts with the government, a receiver of public moneys in a land district charged himself with money which he, or, during his absence, his authorized agents, had received as the purchase price of public lands entered pursuant to the pre-emption laws. The United States, on his failure to pay over the money, brought suit on his official bond. *Held*, that neither he nor his sureties can defeat a recovery by setting up irregularities in the proceedings by which the entry of the lands was allowed. *Id.*

**PURCHASER IN GOOD FAITH.** See *Municipal Bonds*, 4, 5, 7, 8, 11; *Patent for Land*, 3.

**RAILROAD.** See *Causes, Removal of*, 3; *Tax and Taxation*.

1. The same degree of care which a railroad company should take in providing and maintaining its machinery must be observed in selecting and retaining its employés, including telegraphic operators. Ordinary care on its part implies, as between it and its employés, not simply the degree of diligence which is customary among those intrusted with the management of railroad property, but such as, having respect to the exigencies of the particular service, ought reasonably to be observed. It is such care as, in view of the consequences that may result from negligence on the part of employés, is fairly commensurate with the perils or dangers likely to be encountered. *Wabash Railway Company* v. *McDaniels*, 454.

2. In the absence of a special contract, a railroad company, by receiving cattle for transportation over its own line and other lines therewith

RAILROAD (*continued*).

connected, is only bound to carry the cattle over its own line, and deliver them safely to the next connecting carrier. *Myrick* v. *Michigan Central Railroad Company*, 102.

3. A contract whereby the liability of the company is sought to be extended beyond such carriage and delivery will not be inferred from loose and doubtful expressions, but must be established by clear and satisfactory evidence. Taking a through fare on the receipt of the cattle does not establish such liability. *Id.*

4. The receipt of the company, *ante*, p. 103, does not of itself constitute such contract. The circumstances under which it was given should have been submitted to the jury, to determine whether in fact a through contract was made. *Id.*

5. In passing upon the rights of the parties, this court will not be controlled by the judicial decisions of the State where the contract of carriage was made. *Id.*

6. A railroad corporation, whose railroad extends across the State of Wisconsin from Lake Michigan to the Mississippi River, and which is authorized, by its charter, to make "such contracts with any other person or corporation whatsoever as the management of its railroad and the convenience and interest of the corporation and the conduct of its affairs may in the judgment of its directors require;" and, by general laws, to make such contracts with any railroad company, whose road terminates on the eastern shore of Lake Michigan, "as will enable them to run their roads in connection with each other in such manner as they shall deem most beneficial to their interest," and "to build, construct, and run, as part of its corporate property, such number of steamboats or vessels as they may deem necessary to facilitate the business operations of such company or companies;" and also "to accept from any other State or Territory of the United States, and use, any powers or privileges applicable to the carrying of persons and property by railway or steamboat in said State or Territory;" has the power, for the purpose of carrying passengers and freight in connection with its own railroad and business, to enter into an agreement with the proprietors of steamboats running, by way of the Great Lakes, between its eastern terminus and Buffalo in the State of New York, by which it guarantees that the gross earnings of each boat for two years shall amount to a certain sum. *Green Bay and Minnesota Railroad Company* v. *Union Steamboat Company*, 98.

RAILROAD COMPANIES, SUBSCRIPTIONS TO THE CAPITAL STOCK OF. See *Municipal Bonds*.

RAILROAD MORTGAGE. See *Receiver*.

REBELLION. See *Court of Claims*, 2; *Jurisdiction*, 13, 14.

RECEIPT. See *Railroad*, 4.

RECEIVER. See *Equity Pleading and Practice*; *National Banks*, 3–5.

1. Where the complainant prays for the appointment of a receiver of

RECEIVER (*continued*).

mortgaged railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound discretion, may, as a condition of granting the prayer, impose such terms touching the application of the income arising during the receivership to the payment of outstanding debts for labor, supplies, equipment, or permanent improvement of the property, as under the circumstances of the case appear reasonable. *Fosdick* v. *Schall*, 99 U. S. 235, and *Miltenberger* v. *Logansport Railway Company*, 106 id. 286, cited and approved. *Union Trust Company* v. *Souther*, 591.

2. An assignment of such claims as are mentioned in *Union Trust Company* v. *Souther*, p. 591, passes the right of the original holder to payment out of the fund in the hands of the receiver. *Union Trust Company* v. *Walker*, 596.

RECOGNIZANCE. See *Causes, Removal of*, 2.

REGULATION OF COMMERCE. See *Constitutional Law*, 1–4; *Ferry*, 4; *Inspection Laws; Navigable Waters; Wharves and Wharfage*.

REISSUED LETTERS–PATENT. See *Letters-patent*.

REMOVAL OF CAUSES. See *Causes, Removal of*.

RETIRED OFFICERS OF THE ARMY. See *Officer of the Army*.

REVENUE LAWS. See *Causes, Removal of*, 1, 2; *Ferry*, 2.

RIVER. See *Navigable Waters*.

SALE. See *Contract*, 3.

SHIPS AND SHIPPING. See *Admiralty; Maritime Law; Wharves and Wharfage*.

SLAVES. See *Constitutional Law*, 4.

STARE DECISIS. See *Jurisdiction*, 7–11.

STATE AUTHORITY. See *Constitutional Law; Ferry; Inspection Laws; Louisiana; Navigable Waters; Swamp and Overflowed Lands; Wharves and Wharfage*.

STATE BONDS. See *Louisiana; Virginia*.

STATE COURTS. See *Bankruptcy; Causes, Removal of; Jurisdiction*, 1, 2, 5–11; *Louisiana*, 2; *Railroad*, 5.

STATE LAWS. See *Jurisdiction*, 7–11.

STATUTES AND CONSTITUTIONS, CONSTRUCTION OF. See *Corporation*, 2, 3; *Ferry*, 1; *Inspection Laws*, 1, 4; *Jurisdiction*, 7–11; *Louisiana; Missouri; Municipal Bonds*, 2, 3, 5, 6, 11, 12; *Pension; Railroad*, 6; *Virginia; Will*, 2, 6, 10.

STATUTES OF THE UNITED STATES.

The following, among others, referred to, commented on, and explained: —

Ordinance of July 13, 1787. See *Navigable Waters*.

STATUTES OF THE UNITED STATES *(continued)*.

1799. March 2. c. 23.     See *Customs Duties*, 8.

1836. July 4. c. 357, sects. 7, 15.  See *Letters-patent*, 10.

1839. March 3. c. 88, sect. 7.   See *Letters-patent*, 10.

1846. July 30. c. 74.     See *Customs Duties*, 6, 7.

1848. Aug. 14. c. 177.    See *Oregon*, 1.

1850. Sept. 27. c. 76.    See *Oregon*, 2, 3.

1850. Sept. 28. c. 84.    See *Swamp and Overflowed Lands*.

1856. May 15. c. 28.    See *Swamp and Overflowed Lands*, 3.

1857. March 3. c. 98.    See *Customs Duties*, 6.

1861. Aug. 5. c. 45, sect. 4.  See *Court of Claims*, 1.

1864. June 3. c. 106, sect. 12.  See *National Banks*, 2.

1867. March 2. c. 188, sect. 1.  See *Customs, Surveyor of*.

1874. June 22. c. 391.    See *Customs, Surveyor of*.

1875. Feb. 16. c. 77.    See *Admiralty*, 1; *Appeal*, 4.

1881. Feb. 26. c. 82.    See *Criminal Law*, 6.

Rev. Stat., sect. 639.  See *Jurisdiction*, 5.

"    "    "    643.  See *Causes, Removal of*, 1.

"    "    "    989.  See *Customs, Collector of*, 2.

"    "    "   2504.  See *Customs Duties*, 5.

"    "    "   2928.  See *Customs Duties*, 4.

"    "    "   3466.  See *United States, Claims by and against*.

"    "    "   5106.  See *Bankruptcy*.

"    "    "   5201.  See *Criminal Law*, 5; *National Banks*, 1.

"    "    "   5209.  See *Criminal Law*, 1, 4, 5.

"    "    "   5211.  See *Criminal Law*, 6.

STOCKHOLDERS. See *Corporation; Missouri; National Banks*.

SUBSCRIPTIONS TO STOCK. See *Municipal Bonds*.

SURVEYOR OF CUSTOMS. See *Customs, Surveyor of*.

SWAMP AND OVERFLOWED LANDS.

1. The swamp and overflowed lands granted by the act of Sept. 28, 1850, c. 84, are subject to the disposal of the States wherein they respectively lie, and no party other than the United States can question such disposal or enforce the conditions of the grant. *Mills County* v. *Railroad Companies*, 557.

2. The proviso to the second section of the act, that the proceeds of the lands shall be applied exclusively, as far as necessary, to the purpose of reclaiming the same by levees and drains, imposed an obligation which rests upon the good faith of the States. No trust was thereby attached to the lands, and the title to them, which is derived from either of the States, is not affected by the manner in which she performed that obligation. *Id.*

3. The State of Iowa having granted its swamp and overflowed lands to the counties respectively in which they are situate, Mills County, insisting that certain lands were of this character, made claim thereto. The Burlington and Missouri River Railroad Company claimed them under the act of May 15, 1856, c. 28. These conflict-

SWAMP AND OVERFLOWED LANDS (*continued*).

ing claims gave rise to a suit between the parties, which was decided by the State courts in favor of the county. A writ of error was thereupon brought; and, whilst it was pending here, a compromise was entered into by which the county was to make certain conveyances to the company, and to pay it the sum of $10,000 for lands previously disposed of. Conveyances were executed accordingly. Afterwards, the county instituted suit to have the compromise declared void, and the company sued for the $10,000. The State courts having sustained the compromise, and decided against the county in both suits, writs of error were brought here. *Held*, 1. That the county cannot set up that the lands were disposed of contrary to the provisions of the said act of 1850. 2. That although, after the compromise was made, the writ then pending was submitted to this court, and decided in favor of the county, yet that this did not abrogate the compromise, as the parties continued to act under it; and that the decision of the State court in the present cases is not repugnant to, nor in disaffirmance of, the opinion and judgment of this court. *Id.*

TAX AND TAXATION. See *Appeal Bond*, 1; *County; Ferry; Louisiana; Virginia.*

The court (p. 1) denies an application for rehearing in *United States v. Erie Railway Company*, decided at the present term, 106 U. S. 327.

TELEGRAPH EMPLOYÉS. See *Railroad*, 1.

TOBACCO. See *Inspection Laws.*

TONNAGE. See *Ferry*, 4; *Wharves and Wharfage.*

TOWNSHIP BONDS. See *Municipal Bonds.*

TOWN–SITE ACTS. See *Oregon*, 2.

TREASURY DEPARTMENT. See *Customs, Surveyor of.*

TRUST AND TRUSTEE. See *Charitable Gifts and Devises; Corporation*, 3; *County; Criminal Law*, 2–4; *Equity*, 2; *Louisiana*, 2; *Oregon*, 2; *Swamp and Overflowed Lands*, 2; *Trust Deed; Will*, 1, 6, 10–12.

TRUST DEED.

1. By a trust deed, duly recorded, land was conveyed to the trustees in fee, and they were authorized to release it to the grantor upon payment of the negotiable promissory note thereby secured. Before that note was paid or payable, and after it had been negotiated to an indorsee in good faith for full value, a deed of release, reciting that it had been paid, was made to the grantor by the trustees and by the payee of the note, and recorded; and the grantor executed and recorded a like trust deed to secure the payment of a new note for money lent to him by another person, who had no actual notice that the first note had been negotiated and was unpaid, and who, before

TRUST DEED (*continued*).

he would make the loan, required and was furnished with a conveyancer's abstract of title, showing that the three deeds were recorded and the land free from incumbrance. *Held,* that the legal title was in the trustee, under the second trust deed, and that the note thereby secured was entitled to priority of payment out of the land. *Williams* v. *Jackson,* 478.

2. Upon a bill in equity by the holder of a debt secured by deed of trust, to set aside a release negligently executed by the trustee to the grantor, the complainant cannot have a decree for the payment of his debt by the trustee personally. *Id.*

UNITED STATES, CLAIMS BY AND AGAINST. See *Contract,* 2; *Court of Claims; Pension.*

Section 3466 of the Revised Statutes, *ante,* p. 447, which, in certain cases therein mentioned, gives to the United States priority of payment of debts due to it, does not apply to its demands against an insolvent national bank. *Cook County National Bank* v. *United States,* 445.

UNITED STATES, COURTS OF THE. See *Court of Claims; District of Columbia,* 1; *Equity,* 3; *Jurisdiction; Louisiana,* 2.

UNITED STATES MARSHALS. See *Causes, Removal of,* 1, 2.

VERDICT. See *Admiralty,* 1; *Jurisdiction,* 3; *Jury.*

VIRGINIA.

1. By issuing, pursuant to her "funding act" of March 30, 1871, her bonds with interest coupons thereto attached, the State of Virginia entered into a valid contract with every holder of the coupons, whereby she bound herself to receive them at and after their maturity for all taxes and demands due the State. So much of any enactment as forbids the receipt of the coupons for such taxes and demands impairs the obligation of the contract, and is void. *Antoni* v. *Greenhow,* 769.

2. When the coupons were issued, the holder of them could, by the then existing law of the State, as interpreted by her court of last resort, enforce his right under the contract by suing out of that court a *mandamus* compelling the receipt of them by the proper tax-collector, who had refused to accept them when duly offered in payment of State taxes; and the plaintiff, if on the return to the writ judgment was rendered in his favor, could furthermore recover his costs with such damages as a jury might assess, and have forthwith a peremptory writ. By sect. 4 of an act passed Jan. 14, 1882, *ante,* p. 771, when in such a case a *mandamus* is prayed for against the collector, the law imposes upon him as a duty to answer that he is ready to receive the offered coupon as soon as it shall be ascertained to be genuine and legally receivable for taxes. The taxpayer is then required to pay his taxes in lawful money, and file his coupon in the Court of Appeals, by which it is forwarded to the county court of the county, or to the hustings court of the city, where the taxes are payable,

VIRGINIA (*continued*).

> with directions to frame an issue as to whether it is genuine and legally receivable for taxes. Each party is entitled to exceptions and an appeal. If the issue is found for the petitioner, a *mandamus* . is issued, and the money he paid is to be refunded to him out of the State treasury, in preference to all other claims. *Held*, that said sect. 4 furnishes an adequate and efficacious remedy substantially equivalent to that which existed at the date when the coupons were issued, whereby the rights of the holder of them, in case the collector refuses to receive them for taxes, can be maintained and enforced, and that the obligation of his contract with the State is not thereby impaired. *Id.*

> 3. The court does not decide whether the act of the legislature, *ante*, p. 779, approved April 7, 1882, after this suit was brought, repeals said sect. 4 of the act of Jan. 14, 1882, but holds that, if such is its effect, the remedy of the taxpayer is not rendered less efficient, inasmuch as the remaining sections furnish a proceeding which is an exact equivalent of that by *mandamus*, the real matter submitted for determination being whether his coupon ought to have been received in payment of his taxes; and if the issue is found for him, the provision is, without further legislative action, sufficient to authorize and require that the money which he deposited for that purpose shall be refunded to him from the State treasury. *Id.*

WATERS. See *Ferry; Navigable Waters; Wharves and Wharfage.*

WHARVES AND WHARFAGE.

> 1. The city of Parkersburg built within its limits a wharf on the bank of the Ohio River, and prescribed by ordinance certain rates of wharfage on vessels "that may discharge or receive freight, or land on or anchor at or in front of any public landing or wharf belonging to the city, for the purpose of discharging or receiving freight." A transportation company, owning duly enrolled and licensed steamers, which ply between Pittsburgh and Cincinnati and touch at the intermediate points, complained that the wharfage was extortionate, and was merely a pretext for levying a duty of tonnage. The Company thereupon filed a bill in the Circuit Court, praying that the prosecution of a suit brought by the city in the State court to collect the wharfage be enjoined, and that the ordinance be declared void, and for other relief. *Held*, that the character of the charges must be determined by the ordinance itself; and as it on its face imposed them for the use of the wharf only, and not for entering the port or lying at anchor in the river, the court, though it might deem them unreasonable and exorbitant, will not entertain an averment that they were intended as a duty of tonnage, nor inquire into the secret purpose of the body imposing them. *Transportation Company* v. *Parkersburg*, 691.

> 2. Wharfage is the compensation which the owner of a wharf demands for the use thereof; a duty of tonnage is a charge for the privilege

**WHARVES AND WHARFAGE** (*continued*).

of entering, or loading at or lying in, a port or harbor, and can be laid only by the United States. *Id.*

3. The question as to which of these classes, if either, a charge against a vessel or its owner belongs, is one, not of intent, but of fact and law: of fact, whether the charge is imposed for the use of a wharf, or for the privilege of entering a port; of law, whether it is wharfage or a duty of tonnage, as the fact is shown to exist. *Id.*

4. Although wharves are related to commerce and navigation as aids and conveniences, yet being local in their nature, and requiring special regulations at particular places, the jurisdiction and control thereof, in the absence of congressional legislation on the subject, properly belong to the States in which they are situated. *Id.*

5. A suit for relief against exorbitant wharfage cannot, as one arising under the Constitution or the laws of the United States, be maintained in the Circuit Court, even though it be alleged that the wharfage was intended as a duty of tonnage; the alleged intent not being traversable. *Id.*

**WILL.** See *Gift*, 2.

1. In a will containing many legacies, bequests, and devises, each present and immediate in form, to individuals and to charitable institutions, a clause expressing a wish and direction that none of the legacies, bequests, or devises " shall be executed or take effect until " a certain, memorial hall (in fact nearly finished at the time of the execution of the will and of the testator's death) on land previously conveyed by the testator in trust, " shall be completed and entirely paid for out of my estate," does not suspend the vesting, but only the payment and carrying out of the various legacies, bequests, and devises. *Jones* v. *Habersham*, 174.

2. Section 2419 of the Code of Georgia of 1873 does not invalidate a charitable devise contained in a will executed within ninety days before the testator's death, unless he leaves a wife or child or descendants of a child. *Id.*

3. The validity of a charitable devise as against the heir at law depends upon the law of the State where the land lies. *Id.*

4. The validity of a charitable bequest as against the next of kin depends upon the law of the State of the testator's domicile. *Id.*

5. The law of charities is fully adopted in Georgia, as far as is compatible with a free government where no royal prerogative is exercised. *Id.*

6. A parcel of land, with buildings thereon, was devised to the trustees of the Independent Presbyterian Church in Savannah, an incorporated religious society, " upon the following terms and conditions, and not otherwise: " 1st. That the trustees should appropriate annually out of the rents and profits the sum of $1,000 " to one or more Presbyterian or Congregational Churches in the State of Georgia in such destitute and needy localities as the proper officers of said Independent Presbyterian Church may select, so as to promote the cause

WILL (*continued*).

of religion among the poor and feeble churches of the State." 2d. That the trustees should not materially alter the pulpit . or galleries . of the present church edifice, or sell the lot on which the Sabbath-school room of the church stood. 3d. That the trustees should keep in order the burial place of the testator, which he devised to them for that purpose. · *Held*, that under the Code of Georgia of 1873, sect. 3157, the charitable purposes named in the first and third conditions were good charitable uses, sufficiently defined; that the trustees were capable of taking the devise, and that its validity was not impaired by the conditions subsequent. *Id.*

7. A devise to a society incorporated " for the relief of distressed widows and the schooling and maintaining of poor children," of buildings and land, to " use and appropriate the rents and profits for the support of the school and charities of said institution, without said lot being at any time liable for the debts or contracts of said society," is a good charitable devise. *Id.*

8. A devise to a society incorporated " for the relief of indigent widows and orphans in the city of Savannah," of buildings and land, " the rents and profits to be appropriated to the benevolent purposes of said society," is a good charitable devise. *Id.*

9. The rule against perpetuities does not apply to charities; and if a devise is made · to one charity in the first instance, and then over, upon a contingency which may not take place within the limit of that rule, to another charity, the limitation over to the second charity is good. *Id.*

10. A devise to a historical society of a house containing a collection of books, documents, and works of art, in trust to keep and preserve the same, with the collection therein, and other books and works of art to be purchased by the officers of the society out of the income of a fund bequeathed by the devisor for the purpose, " as a public edifice for a library and academy of arts and sciences," and " to be open for the use of the public " on such terms and under such reasonable regulations as the society may prescribe, is a good charitable devise, and is not invalidated by a requirement to place and keep over the entrance. a marble slab with the name of the testator engraved thereon; and if the society is incapable of executing the trust, a court of equity, in the exercise of its ordinary jurisdiction, and under sect. 3195 of the Code of Georgia of 1873, may appoint a new trustee. *Id.*

11. A devise and bequest in trust for the building, endowment, and maintenance of " a hospital for females within the city of Savannah, on a permanent basis, into which sick and indigent females are to be admitted and cared for in such manner and on such terms as may be defined and prescribed by " certain directresses named and their associates, who are to obtain an act of incorporation for the purpose, is a valid charitable devise and bequest, although no time is limited for the erection of the building or the obtaining of the charter. *Id.*

WILL (*continued*).

12. A bequest "to the first Christian church erected or to be erected in the village of Telfairville in Burke County, or to such persons as may become trustees of the same," is a good charitable bequest. *Id.*

WITNESS.

1. A person affected with insanity is admissible as a witness, if it appears to the court, upon examining him and competent witnesses, that he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue. *District of Columbia* v. *Armes*, 519.

2. A witness was, on cross-examination, asked if he had not stated to different parties that he wished the plaintiffs to recover, as he would then get his pay. An objection to the question was made, and the defendant's counsel then declared that he did not propose to impeach the witness. *Held*, that the objection was properly sustained. *Oil Company* v. *Van Etten*, 325.

WORDS.

"Cotton." See *Barber* v. *Schell*, 617.

"Exports." See *People* v. *Compagnie Générale Transatlantique*, 59.

"Final judgment." See *Schell* v. *Cochran*, 625.

"Imports." See *People* v. *Compagnie Générale Transatlantique*, 59.

"Inspection laws." See *People* v. *Compagnie Générale Transatlantique*, 59.

"Migration." See *People* v. *Compagnie Générale Transatlantique*, 59.

WRECK. See *Customs Duties*, 4.

WRIT OF ERROR. See *Bankruptcy; District of Columbia*, 2; *Jurisdiction*, 4.

WRITTEN INSTRUMENTS. See *Contract; Will.*

University Press: John Wilson & Son, Cambridge.